**FILED**
JEANNE A. NAUGHTON, CLERK

JUN 15 2017

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>CARLOS E. TORRES and MARGUERITE TORRES,<br><br>Debtors. | Case No.: 09-34115 (RG) |
| BENJAMIN A. STANZIALE, JR.  as Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>EFTHEMIOS VELAHOS, ESQ., JAMES B. WILSON, PAMELA A. ABRAMS, HOLLY LEWIS, WOODBURY TITLE AGENCY, LLC, SJB HOLDINGS, LLC, FIRST AMERICAN TITLE INSURANCE COMPANY, LANDAMERICA LAWYERS TITLE INSURANCE CORPORTATION, JOHN DOES 1 THROUGH 10, AND XYZ CORPORATIONS 1 THROUGH 10,<br><br>Defendants. | Adv. No. 11-2336(RG)<br><br><br><br>OPINION |

**APPEARANCES:**

**Mellinger, Sanders & Kartzman, LLC**
BY:    Adam G. Brief, Esq.
         Steven P. Kartzman, Esq.
         Joseph R. Zapata, Jr., Esq.

1

101 Gibraltar Drive, Suite 2F
Morris Plains, New Jersey 07950
*Special Litigation Counsel for Plaintiff Benjamin A. Stanziale, Jr.,Chapter 7 Trustee*

**Stanziale and Stanziale, P.C.**
 BY:   Benjamin A. Stanziale, Jr., Esq.
29 Northfield Avenue, Suite 201
West Orange, New Jersey  07052
*Chapter 7 Trustee*

**Rubin, Ehrlich & Buckley, P.C.**
 BY:   Robert L. Grundlock, Jr., Esq.
        Gloria R. Buckley, Esq.
Crossroads Corporate Center
3150 Brunswick Pike, Suite 310
Lawrenceville, New Jersey 08648
*Attorney(s) for the Defendant, First American Title Insurance Company*

### ROSEMARY GAMBARDELLA, BANKRUPTCY JUDGE

## MATTER BEFORE THE COURT

Before this Court is an Adversary Proceeding filed by Benjamin A. Stanziale, in his capacity as Chapter 7 Trustee for the Chapter 7 Estate of Carlos Torres and Marguerite Torres, for various relief under 11 U.S.C. §§ 544(b)(1) and 550, and other relief.  On August 12, 2015, and August 24, 2015, the trial was conducted.  At the conclusion of Plaintiff's presentation, First American moved for judgment under Fed. R. Civ. P. 52(c).   Subsequently, First American presented its defense, and the Court reserved decision. The following constitutes this Court's findings of fact and conclusions of law.

## STATEMENT OF FACTS

The parties by Joint Stipulation dated August 7, 2015, stipulated to the following facts:

### A.  The Parties

2

1. On September 14, 2009, Marguerite Torres ("Ms. Torres") and Carlos Torres ("Mr. Torres," and together with Ms. Torres, the "Debtors") filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.

2. Thereafter, Plaintiff Benjamin A. Stanziale, Trustee, was appointed to serve as the Chapter 7 Trustee, with the duties described in 11 U.S.C. § 704.

3. Efthemios Velahos was also the sole owner of Woodbury Title Agency, LLC ("Woodbury Title"), which maintained its offices at 49 Newton Avenue, Woodbury, New Jersey. Woodbury Title served as the title agency and settlement agent for the June 2007 sale of the Property from the Debtors to James B. Wilson.

4. James B. Wilson ("Wilson" or the "Purchaser"), is an individual residing within the State of New Jersey, who purchased the Property from the Debtors in June 2007.

5. SJB Holdings, LLC ("SJB") is a New Jersey limited liability company with an address at 14 Parke Place Boulevard, Suite B, Sewell, New Jersey.

**B. Background Facts**

6. In or about September 1990, the Debtors purchased the Property [at 19 Miller Drive, Boonton, N.J.], subject to a mortgage of approximately $229,000 in favor of Lancaster Financial Ltd., Inc. The mortgage was assigned on three occasions and in the fall of 2006 was held by Citimortgage, Inc.

7. By October 2006, the Debtors had fallen several months behind on their mortgage. Consequently, Citimortgage, Inc., commenced a foreclosure action in the Superior Court of New Jersey. At that time, the Property was subject to a mortgage lien in the approximate amount of $220,000.

8. As part of the sale of the subject property, the Torres entered into a Residential Lease – Purchase Agreement by which they agreed to be tenants on the subject property and pay rent to SJB Holdings, LLC. (P-6)

9. The sale closed on June 11, 2007, at the offices of Woodbury Title. Woodbury Title served as Settlement Agent.

10. Based upon Woodbury Title's banking records, Credit Suisse funded Wilson's purchase money loan *via* a wire transfer to Woodbury Title on June 11, 2007.

11. Later that same day, Wilson tendered a personal check to Woodbury Title in the amount of $112,208.37. Wilson's check did not clear until June 13, 2011.

12. The Debtors received $150,000 of the net sale proceeds and the satisfaction of their debt ($219,185.04) secured by the mortgage on the subject property held by CitiMortgage, Inc.

13. The Debtors endorsed a check encompassing the remainder of seller's proceeds to SJB Holdings, LLC.[1] (P-15)

14. Nancy Newman Brown, Esq. is First American's designated witness for purposes of Rule 30(b)(6) of the Federal Rules of Civil Procedure.

15. At all times relevant hereto, Woodbury Title and First American were parties to an Agency Agreement dated April 15, 2004.

---

[1] On October 12, 2015, the Trustee filed a Motion for an Order to withdraw joint stipulation number 13, and for leave to file a supplemental post-trial brief addressing Count Seven of the Adversary Complaint, as well as an application to shorten time on the Motion. Motion for an Order to Withdraw Joint Stipulation No. 13, and for Leave to File a Supplemental Post-Trial Brief concerning Count VII of the Adversary Complaint Only (the N.J. Consumer Fraud Act claim), *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 142. The Court entered an Order shortening time on the Motion on October 15, 2015. On November 3, 2015, First American filed a brief in opposition to the Trustee's Motion, and on November 12, 2015, the Trustee field a reply in further support of its motion. On November 17, 2015, the Court held a hearing on the Trustee's Motion. On November 30, 2015, the Court entered an Order Denying the Trustee's Motion to withdraw joint stipulation no. 13. Order Denying Plaintiff's Post-Trial Motion, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 157. At the November 17, 2015 hearing the Trustee reserved the right post-judgment by appropriate motion under F. R. Civ. Proc. 52(b) to assert claims under the New Jersey Consumer Fraud Act against the Defaulting Defendants.

The parties stipulated to the admissibility of pages 20-25 of Ms. Holly Lewis' deposition transcript and various Exhibits P-1, P-2, P-5, P-6, P-7, P-8, P-9, P-10, P-11 through P-23, P-44, D-1 through D-6. The parties also agreed to the authenticity and admissibility of Woodbury Title's Date-Stamped Documents WT-1 through WT-459.

## C. Procedural Background

On September 14, 2009, Carlos E. Torres and Marguerite M. Torres filed a voluntary joint petition under Chapter 7 of the Bankruptcy Code. Chapter 7 Voluntary Petition, *In re Torres*, Case No. 09-34115, ECF No. 1. On September 15, 2009, Benjamin A. Stanziale was appointed as the Chapter 7 Trustee (the "Trustee"). ECF No. 4. On March 28, 2012, the Court entered an Order granting the debtors a Discharge. ECF No. 68.

On September 12, 2011, the Trustee filed the instant adversary proceeding against (1) Efthemios Velahos, Esq. ("Velahos"), (2) Wilson, (3) Pamela A. Abrams ("Abrams"), (4) Holly Lewis ("Lewis"), (5) Woodbury Title, (6) SJB, (7) First American Title Insurance Company ("First American"), (8) LandAmerica Lawyers Title Insurance Corporation, (9) John Does 1 through 10, and (10) XYZ Corporations 1 through 10. Adversary Complaint, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 1. Counts One and Two of the Complaint allege fraudulent transfer against Wilson and SJB, respectively under 11 U.S.C. §§ 544(b)(1), 550 and N.J.S.A. 25:2–25(b). Counts One and Two of the Complaint seek to avoid the transfer and disbursement under Section 544(b)(1) of the Bankruptcy Code and N.J.S.A. 25:2–27(a), and recover the value of the transfer and disbursement under Section 550. Counts Three and Four of the Complaint allege claims for fraudulent transfer against Wilson and SJB, respectively, claiming that Debtors did not receive equivalent value in exchange for the transfer and disbursement, and that Debtors were insolvent or became insolvent as a result of the transfer and

disbursement. Counts Three and Four seek to avoid the transfer and disbursement to Wilson and SJB pursuant to Section 544(b), and to recover the value of the transfer pursuant to Section 550. Counts Five and Six seek to recover the value of the transfer and disbursement, respectively, from Wilson and SJB, pursuant to Section 550 of the Bankruptcy Code. Count Seven of the Complaint allege claims against Wilson, SJB, Velahos, Woodbury Title, Abrams, and Lewis under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1 *et seq.*, seeking treble compensatory damages, as well as consequential and punitive damages. Counts Eight and Nine of the Complaint allege legal and equitable fraud, respectively, against Wilson, SJB, Velahos, Woodbury Title, Abrams, and Lewis. Count Ten of the Complaint alleges negligent misrepresentation against Wilson and SJB. Counts Eleven and Twelve of the Complaint allege civil conspiracy, and aiding and abetting civil conspiracy, fraud (legal and equitable) misrepresentation, respectively, against all defendants. Count Thirteen of the Complaint alleges conversion against Wilson and SJB. Count Fourteen of the Complaint alleges vicarious liability against First American and Lawyers Title. Count Fifteen seeks to pierce the corporate veil against SJB, and Count Sixteen seeks to declare that Wilson used SJB as his alter ego such that Wilson and SJB may be held jointly and severally liable. Count Seventeen alleges legal malpractice against Velahos, and Count Eighteen alleges negligence of settlement agent against Velahos, Abrams, Lewis, and Woodbury Title. Finally, Count Nineteen seeks to recover legal fees against all defendants.

### *Defendant First American*

On October 21, 2011, First American filed a Motion for Summary Judgment. Motion for Summary Judgment, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 4. First American asserted that "the claim against First American boils down to a vicarious liability claim for the

alleged conduct of Woodbury Title. First American cannot be held vicariously liable for the conduct alleged against Woodbury Title which involves intentionally unlawful, not to say illegal, conduct." *Id.* at 1. First American argued that its association with Woodbury Title is contractual and limited, and any liability First American may have is limited exclusively to its insureds, which Plaintiffs are not. *Id.* at 7. First American noted that "[n]o case anywhere imposes liability upon a title insurance underwriter to third parties or sellers for the conduct of an agent. No such liability has ever been found to exist." *Id.* First American requested, therefore, that the Court grant summary judgment in its favor and dismiss the Complaint against it. *Id.* at 8.

On November 28, 2011, the Trustee filed a Cross-Motion for partial summary judgment and opposition to Defendant's motion for summary judgment. Cross-Motion for Partial Summary Judgment, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 6. The Trustee claimed there were "at the very least triable issues precluding summary judgment including whether Woodbury Title was an 'agent independent contractor' of [First American], and whether [First American] can be vicariously liable for Woodbury Title's actions." *Id.* at 2. The Trustee argued that the characterization of the relationship between First American and Woodbury Title is an issue of fact, and therefore summary judgment must be denied. *Id.* at 6. Additionally, the Trustee argued that whether First American is vicariously liable for the actions of Woodbury Title is a triable issue, and therefore summary judgment must be denied. *Id.* at 16. The Trustee also cross-moved for partial summary judgment against First American, seeking a declaration that Woodbury Title was an "agent independent contractor" of First American. *Id.* at 3.

On March 2, 2012, counsel for the Trustee filed an Affidavit of Merit pursuant to

N.J.S.A. 2A:53A–27, consisting of an Affidavit of Edward Wacks, Esq. Affidavit of Merit,

*Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 31.[2]

On October 2, 2012, the Court held a hearing on First American's Motion for Summary

Judgment, and the Trustee's Cross-Motion for Summary Judgment.  At the conclusion of the

hearing, the Court reserved decision.

On July 16, 2013, pursuant to a decision placed on the record on July 11, 2013, this Court

entered an Order denying without prejudice both First American's Motion for Summary

Judgment and the Trustee's Cross-Motion for Summary Judgment.  Order Denying (1) First

American's Motion for Summary Judgment and (2) Plaintiff's Cross-Motion for Partial

Summary Judgment, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 64.

On July 19, 2013, First American filed an Answer to the Trustee's Complaint with Jury

Demand, denying the allegations against it and demanding dismissal of the Complaint as against

it.  Answer to Complaint, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 65.  Without

admitting liability to the plaintiff First American stated by way of cross-claim that it is entitled to

contribution pursuant to N.J.S.A. 2A:53A–1 and N.J.S.A. 2A:15–5.1, or indemnification from

the other defendants.

---

[2] Edward Wacks is an attorney, admitted to practice law in the State of New Jersey in 1968, with
a practice located in Morristown, New Jersey. Mr. Wacks described the transaction between the
Debtors and the Defendants as a "classic foreclosure scam." *Id.*, ¶ (4)(h).  Based upon his review
of the record, he opined that Velahos's conduct "fell outside acceptable professional and legal
standards required of New Jersey attorneys in his dealings with clients and non-clients." *Id.*, ¶ 5.
Mr. Wacks also opined that "Woodbury [Title] in serving as the settlement agent and disbursing
the proceeds of the sale of the Property fell outside professional title insurance agency
standards." *Id.*, ¶ 6.  He concluded that these deviations from professional standards "are a
substantial contributing factor to the losses that the bankruptcy estate has realized and may
continue to realize." *Id.*

8

On October 23, 2013, First American filed a second Motion for summary judgment. Motion for Summary Judgment, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 75. First American noted that Debtors were the sellers in the transaction, and that there was no authority to permit a seller to recover against a buyer's title insurer under theories of agency or apparent authority. First American argued that, "no facts have been proffered against First American which could be construed to create liability. No legal theory applies." *Id.* at 9. Therefore, First American requested that summary judgment be granted in its favor.

On January 21, 2014, the Trustee filed a Response in Opposition to the Motion for Summary Judgment. Opposition to First Am. Title Ins. Co.'s Motion for Summary Judgment, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 81. The Trustee argued that genuine issues of fact existed, including whether Woodbury Title was an agent independent contractor of First American, and whether First American could be held vicariously liable for the actions of Woodbury Title. *Id.* at 14. The Trustee urged that the Court already found such a question of fact existed in First American's prior summary judgment motion. Therefore, the Trustee argued the Motion for Summary Judgment should be denied.

On April 23, 2014, the Court held a hearing on First American's second Motion for Summary Judgment. At the conclusion of the hearing, the Court reserved decision. On February 13, 2015, pursuant to an oral decision delivered on the record on February 11, 2015, this Court entered an Order denying First American's Motion for summary judgment without prejudice. Order Denying First American's Motion for Summary Judgment, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 103.

***Defendants Velahos, Abrams, Lewis, and Woodbury Title***

9

On November 4, 2011, the Velahos Law Firm filed an Answer to the Complaint on behalf of Pamela A. Abrams, Holly Lewis, Efthemios Velahos, and Woodbury Title Agency, LLC. Answer to Complaint, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 5. The Answer asserts several affirmative defenses, as well as a cross-claim for indemnification against Wilson and SJB. *Id.* at 20.

On September 25, 2013, Velahos filed a Motion to withdraw as counsel for Abrams and Lewis. Motion to Withdraw as Counsel, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 73. Velahos indicated that Abrams and Lewis' interests and defenses may be in conflict with his interest as a defendant in the action, and that he has been unable to contact either Abrams or Lewis. *Id.* On November 8, 2013, the Court requested that Velahos submit a Certificate of Service in connection with the Motion to Withdraw. On October 23, 2014, Velahos withdrew the Motion to Withdraw and refiled the motion to withdraw with a certificate of service. Motion to Withdraw as Attorney, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 99.[3]

On August 4, 2015, the Court received correspondence from Velahos, which stated the following in relevant part:

> Please be advised that it is my intention not to appear at trial [ ] in the above-captioned matter. Neither Holly Lewis nor Pamela Abrams, both former Woodbury Title Agency employees for which I answered the initial complaint (and with respect to Lewis represented at a deposition in 2012) have responded to my regular or certified mail for over two years.

> Furthermore, in accordance with my prior motion, at this point in time, and most notably since I am a named defendant in the matter, could represent a conflict. Moreover, I am no longer practicing law and believe I am on the ineligible list.

> I plan to file for bankruptcy and am not at issue with accepting a default with regard to the underlying case at hand.

---

[3] Apparently an Order granting or denying Velahos' motion was never entered.

Correspondence from Velahos dated August 4, 2015, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 128.

Velahos further claimed that he planned to file for bankruptcy, and that he was "not at issue with accepting a default with regard to the underlying case at hand". *Id.* Further, Velahos advised the Court that he is no longer practicing law. *Id.*

### Defendants Wilson and SJB

On December 1, 2011, the Trustee filed a Request to Enter Default against Defendant James B. Wilson. Request to Enter Default, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 8. On December 8, 2011, default was entered against James B. Wilson. *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 9.

On July 11, 2014, the Trustee filed a notice of voluntary dismissal as to Wilson only. Notice of Voluntary Dismissal re: as to James B. Wilson Only, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 98.

SJB has not appeared or filed an Answer in this proceeding.

### Defendant LandAmerica Lawyers Title Insurance Company

On March 14, 2012, defendant Fidelity National Title Insurance Company ("Fidelity"), as successor by merger to Lawyers Title Insurance Corporation, "improperly plead" as LandAmerica Lawyers Title Insurance Company ("LandAmerica") filed an Answer to the Complaint. Answer to Adversary Complaint of Fidelity National Title Insurance Company, Improperly Plead as LandAmerica Lawyers Title Insurance Corporation, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 34. Fidelity also set forth affirmative defenses, and a cross claim for contribution and common law indemnification against each of the Co-Defendants. *Id.*

On May 22, 2013, LandAmerica filed a Motion for summary judgment.   Motion for Summary Judgment, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 57.   On July 17, 2013, the Court entered a Consent Order resolving LandAmerica's Motion for Summary Judgment.   Consent Order Resolving Land America Lawyers Title Insurance Company's Motion for Summary Judgment, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 63.   The Consent Order dismissed all claims in the Complaint against LandAmerica without prejudice and without costs.  *Id.*

### All Remaining Defendants - Trial

Pre-Trial

On August 7, 2015, the Trustee and First American filed a Joint Stipulation of undisputed facts and stipulation as to authentication and admissibility of exhibits. Joint Stipulation, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 130.   On that same day, the Trustee and First American each filed their respective trial briefs. ECF Nos. 129, 131. On August 10, 2015, the Trustee submitted supplemental proposed findings of disputed facts. ECF No. 133.

Trustee's Trial Brief

On August 7, 2015, the Trustee filed his Trial Brief as well as Proposed Findings of Disputed Facts and Conclusions of Law, and list of Trial Exhibits.   Plaintiff's Trial Brief, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 129.  On August 10, 2015, the Trustee filed a "witness list" and a "Supplemental Proposed Findings of Disputed Facts" asking that the Court declare certain testimony of Mr. Velahos taken at a deposition in this proceeding on April 19, 2012 admissible under Fed. Rule Civ. P. 32(a)(3).  ECF Nos. 133-134.

On that same date the Trustee filed a "Proffer of Adam G. Brief, Esq. as to (i) Authentication of Documents Obtained from the New Jersey Division of Consumer Affairs and

(ii) Unavailability of Holly Lewis" requesting the admission of Lewis' April 19, 2012 deposition

pursuant to Fed. Rule Evid. 804(a)(5), 804 (b)(1) and Fed. Rule Civ. P. 32 (a)(3) and (a)(4)(B).

ECF No. 132.

As to Count VIII, the Trustee seeks a judgment against SJB, Woodbury Title, Abrams,

Lewis and Velahos for legal fraud. Plaintiff's Trial Brief, *supra*, at 2. The Trustee notes that to

establish a claim of legal fraud he must show: (1) a material misrepresentation or omission of a

presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an

intention that the other person rely on it; (4) reasonable diligence thereon by the other person;

and (5) resulting damages. *Id.* (citing *In re Curriden*, No. 05-38352 JHW, 2007 WL 2669431, at

*16 (Bankr. D.N.J. Sept. 6, 2007)). The Trustee argues that those elements have been met

because Debtors were not advised that the sale of the Property would generate net sale proceeds

of $401,698.27 that belonged to them, that $251,000 of the proceeds would be delivered to SJB,

and that Woodbury Title would disburse the $251,000 in a manner inconsistent with the HUD,

against the lender's closing instructions, and without Debtors' knowledge or consent. *Id.* The

Trustee alleges that defendants concealed this from Debtors with the intent that Debtors rely on

these material omissions of fact to consummate the sale, that Debtors did rely on those

omissions, and as a result suffered damages, including being deprived of $250,000 of equity in

their home. *Id.* at 3.

The Trustee asserts that Wilson, acting on behalf of SJB, and Abrams and Lewis on

behalf of Woodbury Title, knew the omission of material fact would mislead the Debtors and

that Defendants' actions deprived them of more than $250,000.00 of equity in their home. *Id.*

The Trustee asserts that Velahos was the sole owner and managing member of Woodbury

Title, and routinely allowed Abrams and Lewis to prepare and sign his name to deeds, including

the deed in this case. *Id.* at 4. The Trustee argues that, as the director of a closely held corporation, Velahos is liable for any damages resulting from "misappropriation by insiders of the company." *Id.* (citing *Francis v. United Jersey Bank*, 87 N.J. 15, 39 (1981)). The Trustee alleges that Velahos' oversight in his responsibility fostered a culture of fraud at Woodbury Title and contributed to the losses suffered by Debtors. *Id.* Therefore, the Trustee argues that SJB, Abrams, Lewis, Velahos, and Woodbury Title are liable for legal fraud, and the damages flowing therefrom. *Id.* at 5.

Next, the Trustee, by Count IX of the Complaint, seeks judgment against SJB, Woodbury Title, Abrams, and Lewis and Velahos for equitable fraud. *Id.* The Trustee notes that to sustain a claim for equitable fraud, he must show: (1) a material misrepresentation of a presenting existing or past fact; (2) an intention that the other person rely on it; and (3) detrimental reliance by the other person. *Id.* at 6 (citing *Toll Bros. v. Bd. of Chosen Freeholders of Cty. of Burlington*, 194 N.J. 223, 254, 944 A.2d 1, 19 (2008)). The Trustee argues that because he has proven a claim for legal fraud, he has also proven the "less demanding elements" of equitable fraud. *Id.*

Third, the Trustee by Count XI seeks judgment against SJB, Woodbury Title, Abrams, Lewis and Velahos for civil conspiracy. *Id.* The Trustee notes the elements of conspiracy are: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages. *Id.* (citing *In re Curriden*, 2007 WL 2669431, at *8). The Trustee argues the elements have been met because defendants acted together "to consummate the equity stripping scheme in this case against the Debtors." *Id.* at 7.

The Trustee claims Debtors suffered special damages including loss of title to their Property and loss of equity in excess of $250,000.

Fourth, the Trustee by Count XII seeks a judgment against SJB, Woodbury Title, Abrams, Lewis, and Velahos for aiding and abetting fraud and civil conspiracy. *Id.* at 8. The Trustee notes that to establish a cause of action for aiding and abetting fraud he must show existence of an independent wrong, knowledge of that wrong, and substantial assistance on the part of the aider or abettor to effectuate that wrong. *Id.* (citing *State, Dept. of Treasury, Div. of Inv. Ex rel. McCormac v. Qwest Comm. Intern. Inc.*, 387 N.J. Super. 469, 481-82 (App. Div. 2006)). The Trustee argues that the independent wrong was the equity stripping scheme, and that the parties provided assistance to the scheme by enlisting the other defendants, obtaining a mortgage for Wilson, conducting the closing in a fraudulent manner by, among other things, disbursing sale proceeds to SJB who was neither the seller nor buyer in a manner inconsistent with the HUD and Lenders closing instructions and without any authorization or document to support such disbursement and fostering an environment where employees may engage in fraudulent conduct. *Id.* at 8-9. The Trustee continues that the equity stripping scheme could not have been perpetrated without the knowing and voluntary participation and substantial assistance of each of the defendants. *Id.* at 9.

Finally, by Count XIV the Trustee argues that First American is vicariously liable for the wrongful actions of Woodbury Title, Velahos, Abrams, and Lewis. *Id.* This conclusion is premised on a finding that Woodbury Title is an agent independent contractor of First American. The Trustee argued, comparing the instant facts to those in *Lawyers Title Ins. Co. v. Phillips Title Agency*, 361 F. Supp. 2d 443 (D.N.J. 2005), that an independent contractor can be an agent, and that a principal can be vicariously liable for the actions of its agent independent contractor, and

its sub-agents, for actions taken within the scope of authority, even if such actions were not authorized. *Id.* at 13. The Trustee claims that Woodbury Title had the power to bind First American, under an Agency Agreement such that Section 1 of the Agency Agreement provides that Woodbury Title was "authorized to originate and solicit applications for title insurance" and to "issue commitments to insure" and "countersign policies of title insurance" on the Defendants' behalf, and that the indemnification provisions in that agreement at Section 13, among other things, "demonstrates that it was foreseeable to First American that Woodbury Title would engage in fraud, deceit, or misrepresentation in connection with a closing that it performs" as it provided for indemnification in such instances. *Id.* at 16-17. The Trustee also claims that it was reasonable for Debtors to rely on Woodbury Title's actions. The Trustee argues, at the very least, that Woodbury Title acted with apparent authority in conducting closings, which demonstrates its power to bind First American. *Id.* at 18. Therefore, the Trustee argues that vicarious liability attaches to First American for the actions of Woodbury Title. The Trustee asserts that Velahos was the owner of Woodbury Title, that Lewis and Abrams were employees of Woodbury Title, that Velahos, Abrams and Lewis were subagents of Woodbury Title, and that Velahos, Abrams and Lewis acted within the scope of their employment with Woodbury Title and its agency relationship with First American. Alternatively, Trustee asserts that Woodbury Title, Velahos, Abrams and Lewis were agents of First American and were aided in their conduct by the existence of the Agency Agreement between First American and Woodbury Title.

The Trustee argues there are two alternate bases to impose vicarious liability on First American. *Id.* at 19. First, the Trustee argues that vicarious liability attaches because Woodbury Title, Velahos, Abrams, and Lewis acted within the scope of the agency relationship with First American, even if the specific conduct was not authorized. *Id.* Alternatively, the Trustee argues

that First American is vicariously liable because even if the actions of Woodbury Title, Velahos,

Abrams, and Lewis was outside the scope of the agreement, those parties' actions were aided in

accomplishing the torts complained of by the existence of the agency relationship. *Id.* at 19-20

(citing *In re Curriden*, 2007 WL 2669431, at *13).

First American's Trial Brief

On August 7, 2015, First American filed its Trial Brief along with "Proposed Findings of

Undisputed Facts". First American's Trial Brief, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336,

ECF No. 131.

First, First American argues that it is not liable to Plaintiff under a negligence theory. *Id.*

at 4. First American argues that it provided title insurance to Wilson and his lender, and as a title

insurance underwriter, it is not responsible for policing real estate transactions. *Id.* at 4-5 (citing

*Shotmeyer v. N.J. Realty Title Ins. Co.*, 195 N.J. 72, 82 (2006)). First American notes that the

Debtors are not insureds of First American, and argues there is no case law in New Jersey

establishing any duty owed by a title insurance underwriter to a non-insured. *Id.* at 4-5.

Additionally, First American argues that a title insurance underwriter is not liable for negligence,

even to its insureds, absent some other duty assumed by the underwriter. *Id.* at 6 (citing *Walker

Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 535 (1989)).

First American next argues that it is not liable to Plaintiff under a theory of vicarious

liability. *Id.* First American asserts that Woodbury Title is a non-employee agent of First

American for a limited purpose, and therefore liability does not extend to First American in this

instance. *Id.* at 6-7 (citing *JMB Enterprises v. Atlantic Employers Ins. Co.*, 228 N.J. Super. 610

(App. Div. 1988)). First American argues that any claim of liability against it is limited to the

contract with Woodbury Title. *Id.* at 7-8 (citing *Johnson v. MacMillan*, 233 N.J. Super. 56 (App.

Div. 1989)). Therefore, First American claims that it cannot be held liable for any intentional conduct of Woodbury Title, or for any tort liability attributed to Woodbury Title if the principal did not direct or participate in them. *Id.* at 8 (citing *Baldasasarre v. Butler*, 132 N.J. 278, 291 (1993)).

First American argues this matter is similar to *Karpontinis v. Multi Solutions Inc.*, No. A-4949-11T3, 2013 N.J. Super. Unpub. LEXIS 641 (App Div. Mar. 21, 2013). The court in *Karpontinis* held that "[i]ndividuals who are not 'named insureds' under the policy cannot recover." *Id.* at *9-10. The court noted that "[t]here is no authority that permits a seller or non-party to a real estate transaction … to recover against a buyer's title insurer under theories of agency or apparent authority." *Id.* at *10. First American similarly relies on *Duffy v. Lawyers Title Ins. Co.*, 972 F. Supp. 2d 683 (E.D. Pa. 2013) and *Sommers v. Smith & Berman, P.A.*, 637 SO.2d 60 (Fla. Ct., App. 1994) to argue that a title insurance company has not been found in any case law to be liable for actions of a title company under these circumstances. First American's Trial Brief, *supra*, at 10-11. Finally, First American notes that in *N.J. Lawyers' Fund for Client Protection v. Flanagan*, No. L-3198-11, 2014 N.J. Super. Unpub. LEXIS 1127 (Sup. Ct. Law Div. Feb. 4, 2014) (the "CPF case"), the court cited the *Karpontinis* case with approval. *Id.* at 11.

First American argues that not even an insured could have such a claim as presented by Plaintiff against a title insurance company, and therefore a seller certainly cannot maintain such a claim. *Id.* at 12.

Next, First American argues that the Trustee's reliance on *Sears Mortgage v. Rose*, 134 N.J. 326 (1993) is without merit because the Trustee "fails to understand the basis for the decision in that case." *Id.* at 12. First American argues that because the facts are not similar to

those presented in *Sears Mortgage*, that case is unpersuasive. *Id.* at 14.    Similarly, First American argues that the Trustee misreads *Lawyers Title*, 361 F. Supp. 2d 443. *Id.* First American claims that "[n]o case has ever extended title insurance underwriter liability to a seller. No vicarious theory of liability exists to impose such liability." *Id.* at 16.

Finally, First American argues that the Trustee's legal theory would upset the statutory system established for the title insurance business. *Id.* First American notes that statutory law limits title insurance underwriters to providing only title insurance, and that premiums cannot be adjusted annually. *Id.* (citing N.J.S.A. 17:46B-12). First American argues that "[a]ny attempt to impose liability on a title insurance underwriter outside the parameters of title insurance necessarily calls for an adjustment in the premium charged for title insurance." *Id.* at 17. Additionally, First American notes that the legislature, not the courts, have the authority to enact substantive insurance laws, and any decision recognizing the Trustee's claim would intrude on the legislature's authority to do so. *Id.* at 17-18.

First American concludes that no legal basis exists to hold it liable, and therefore the Court should dismiss the Complaint against it.

<u>Trial Conducted on August 12, 2015 and August 24, 2015</u>

On August 12, 2015 and August 24, 2015, the parties appeared before this Court for trial.

At the start of the trial, the Trustee requested that the Court enter default against Velahos, Abrams, Lewis, Woodbury Title, and SJB Holdings due to their lack of appearance at the hearing. Defendant Wilson had previously been dismissed from the proceedings.  The Court noted Velahos' emailed letter which advised the Court that he would not be appearing in Court. First American asserted as to entry of default against Woodbury Title, Defendant was protected under the New Jersey Affidavit of Merit statute N.J.S.A. 2A:53A–27 and that the Trustee had not

presented any expert testimony regarding standards governing title agents in New Jersey, such that default could not be entered against Woodbury Title. The Trustee responded that he was not proceeding on any negligence claim against Woodbury Title but proceeding on claims sounding in tort, fraud, legal fraud, equitable fraud and civil conspiracy. The Court noted the objection, but stated that it was clear that the parties that remain in the proceeding have not appeared to defend against the allegations of the Complaint. The Court reserved decision on whether it is appropriate to enter default against Woodbury Title as well as the other defaulting Defendants.

The Trustee opened by arguing that as a result of an "equity stripping sale leaseback transaction" perpetrated by a number of the Defendants, Debtors were defrauded out of title to their property as well as some $251,000 in net sale proceeds. Trustee claimed that Debtors were never informed that the net sale proceeds were available to them, and those proceeds that were diverted to SJB should properly belong to the Debtors. The Trustee stated that, due to the Agency Agreement between First American and Woodbury Title, Woodbury Title was an agent independent contractor and First American is therefore vicariously liable for the actions of Woodbury Title.

First American first argued that there is no cause of action against it. First American claimed that the Debtors voluntarily endorsed a check to SJB as part of the transaction. Therefore, the allegation must be that Woodbury Title should not have cut that check, but Debtors endorsed the check, and the Trustee presents no expert to testify that the check should not have been cut or that Woodbury Title violated standards of conduct. First American claimed that the Trustee has presented a cause of action, which goes against applicable New Jersey case law and that First American had no involvement, participation, or direction with regard to the transaction, let alone the alleged wrongdoing in the alleged equity-stripping scheme.

20

First American argued that it cannot be held liable in tort as a title insurance underwriter to a seller of real estate based upon the conduct alleged against the title agent and that New Jersey law does not support the imposition of such liability on an agency theory or otherwise and further that the non-exclusive agency agreement between First American and Woodbury Title is a contract that limits the scope of agency to the area of providing title insurance.

Ms. Marguerite Torres testified first at the trial.

Marguerite Torres and Carlos E. Torres have been married for 33 years.  In 1990, the Debtors purchased the Property for $285,000.00 and financed the purchase with a mortgage.  In 2006, the Debtors fell behind on mortgage payments for the Property. The Debtors owned an aquarium and pet supply center. The Debtors' business relocated due to needed repairs in the business's rented space, which allegedly caused a drop in revenues, contributing to Debtors' financial struggles. Additionally, in 2006, Mr. Torres developed health issues including end-stage renal failure, which also contributed to the couples' financial struggles.

In 2006, CitiMortgage began foreclosure proceedings on the Property. (Exs. P-1, P-2). Ms. Torres claimed that the Debtors could not afford an attorney to represent them in this matter, and that she did not wish to sell the home. Ms. Torres additionally stated that the Property needed repairs, but Debtors did not have the money to complete the necessary repairs to the home.

Ms. Torres testified that she received a brochure in the mail from SJB, which indicated that it could assist in saving a home if they were behind on mortgage payments. (Ex. P-3). Ms. Torres, following up on the mailing, spoke to an individual named Christopher Roesly at SJB, who discussed the program and scheduled an appointment for a house visit. Debtors were told they would sell the house, pay of the mortgage, continue living in the house, and at the end of the

year, if they could, buy the house back. Ms. Torres stated she was very interested in the program to avoid the foreclosure. She noted that members of SJB called often in a month's time frame to inquire whether Debtors were interested in the program. Ms. Torres noted that she felt a time pressure to pursue the program before the bank proceeded with foreclosure.

Torres testified that Chris Roesly, Wilson and another person who she could not identify visited the Property, inspected the Property and discussed the amount owed on the Property. At the conclusion of the visit, SJB offered to buy the Property, give the Debtors a year to rent the house, and give the Debtors an option to purchase the house for a set amount at the end of the one-year lease. Members of SJB followed up with Ms. Torres several times, but never suggested she hire a lawyer or real estate agent. Ms. Torres testified that she saw the offer from SJB as a way to save her home, and feeling she needed to act quickly, entered into the proposed transaction with SJB. The transaction with SJB consisted of selling the property to Wilson. Ms. Torres obtained an appraisal on the property through an appraiser arranged through SJB. The appraisal was for $625,000.00 (Ex. P-4). According to Ms. Torres, the Debtors did not negotiate any terms of the contract for sale as the sale price was set by the appraisal. The Debtors were not represented by an attorney and, according to Ms. Torres, no one reviewed the terms of the contract with them before signing the contract.

On May 16, 2007, the Debtors and Wilson entered into a "Contract For Sale of a One-To-Four Family Residential Property" to sell the property to Wilson for $625,000.00. (Ex. P-5). Ms. Torres testified that she believed the Contract of Sale was prepared by either Mr. Wilson or Chris Rosely. Ms. Torres testified that the Debtors signed the contract at their home. The witness signature on the contract appeared as "Brian J. Mammoccio". Ms. Torres testified that the Debtors attended a closing on the contract of sale at the office of Woodbury Title.

On May 16, 2007, the Debtors also entered into a separate lease agreement, "Residential

Lease-Purchase Agreement" with SJB. (Ex. P-6).  Under the agreement, Ms. Torres testified that

she understood that the Debtors would remain on the Property for one year, and would not be

charged any rent because it was included in "the settlement". The agreement listed SJB as the

"landlord" and the Debtors as "tenants", although Wilson was the purchaser of the Property.  Ms.

Torres testified that she did not know who prepared the Lease Agreement, that the terms were

presented to the Debtors without negotiation and that she understood that SJB and Wilson were

"a group" and the property was put in Wilson's name.

Ms. Torres testified that she did not believe that after one year there was an offer to

extend the lease for additional time.  She understood that the agreement included a provision or

option for the Torreses to repurchase the property from the landlord within the one year period

and retain any and all equity in the property for a value over $531,250.00.  The purchase price to

exercise the option was $531,250.00.  Ms. Torres testified that SJB and the other parties

determined the option price. Ms. Torres also understood that the tenants were responsible for all

repairs on said property.  In fact, the Residential-Lease Purchase Agreement provided:

> THIS AGREEMENT, dated May 16, 2007, is between SJB Holdings LLC, the
> Landlord(s) and Carlos E. & Marguerite M. Torres, the Tenant(s).  In consideration of the
> payment of rent and the keeping and performance of the covenants and agreements by the
> Tenant hereinafter set forth, the Landlord(s) do hereby lease unto the Tenant(s), the
> following described premises situate in the County of Morris, State of New Jersey and
> better known as 19 Miller Drive, Boonton, NJ. 07005. The said premises, as described
> above, with all appurtenances, are hereby leased to the Tenant for a term of 12 months
> commencing on June 1, 2007. Rent for the premises is payable in monthly installments
> of: $ 0 per month to be paid on or before the fifth day of the month for which rent is due.
>
> THE TENANT, CONSIDERATION OF THE LEASING OF SAID PREMISES AS
> AFORESAID, COVENANTS AND AGREES AS FOLLOWS:
> To pay the rent for said premises as hereinabove provided;
> To keep said premises in good condition and repair and at the expiration of the lease
> surrender and deliver up to the same in as good order and condition as when entered

upon, loss by fire, inevitable accident, act of God or ordinary wear and tear excepted;
To obtain and continue to have renters' insurance during the course of this Lease.

IT IS FURTHER AGREED that in case said premises are left vacant, then the Landlord
may, without being obligated to do so and without terminating the lease, re-take
possession of the premises. If any part of the rent herein reserved be unpaid, the
Landlord may rent the same for such rent, as the Landlord may be able to do so, making
such changes and repairs as may be required, giving credit for the amount so received,
less all expenses.

It is agreed that if the tenant shall be in arrears in the payments of any installments of rent,
or any portion thereof, or in default of any of the covenants or agreements herein
contained to be performed by the Tenant, which default shall be uncorrected for a period
of five (5) days after the Landlord has given written notice thereof, Landlord may, at this
option, without liability for trespass or damages, enter into and upon said premises, or a
portion thereof; declare the term of this Lease ended; repossess the said premises as of the
Landlord's former estate; peaceably expel and remove the Tenant, those claiming under
him, or any person or persons occupying the same and their effects; all without prejudice
to any other remedies available to the Landlord for arrears of rent or breach of covenant.

IT IS FURTHER MUTUALLY AGREED that the Landlord, in consideration of the
performance of all the covenants and agreement herein to be performed by the Tenant
under the Lease, and the Tenant agreeing to perform all repairs and replacement of any
appliances, including, but not limited to, refrigerator, stove, heater, air conditioner, etc. to
the property during the term of the said lease, hereby grants to Tenant an exclusive option
to purchase said above described premises at any time during the term of this lease for the
sum of $ 531250.00.

During the lease period commencing June 1, 2007 for a period of 12 months, with a 6
month extension period Carlos E. & Marguerite M. Torres may request and SJB
Holdings, LLC agree and fully cooperate with having the property at 19 Miller Drive,
Boonton, NJ. 07005 listed exclusively and actively marketed by a licensed real estate
broker and entered into a multiple listing service. SJB Holdings, LLC authorize Carlos
E. & Marguerite M. Torres to negotiate the terms of the sales contract during the first
year including the selection of the realtor and listing Real Estate Company. SJB
Holdings, LLC agree to accept any offer that Carlos E. & Marguerite M. Torres deem
appropriate for a sales price of $531250 or higher minus closing cost. All monies over
$531250 will be given to Carlos E. & Marguerite M. Torres at settlement.

At the end of the term of this Lease, Tenant is required to obtain a mortgage to purchase the
aforesaid property and have first right of refusal. Should Tenant be unable to obtain a mortgage at
that time, Tenant reserves the right to either sell the property or continue the Lease for an
additional 6-month term.

During the lease period of months 13 through months 18 of the term of the lease, SJB
Holdings, LLC will provide to Carlos E. & Marguerite M. Torres, upon request, a
Verification of Rent providing verification of rent payments made. Said rent payments during that
period will be $5416.00 per month.

24

If the tenants' purchase the home from the landlord, the tenants will retain any and all equity in the property for any value over$ 531250.00.

Tenant shall be responsible for all repairs to said property.
Tenant shall not be permitted the right to subletting or assignment.

This Contract will be binding upon the parties and each of their respective heirs, executors, administrators, successors and permitted assignees. The provisions hereof will survive the delivery of the deed and will not be merged therein. This Contract, unless amended in writing, contains the final and entire agreement of the parties and the parties will not be bound by any terms, conditions, oral statements, warranties or representations not herein contained. The laws of the appropriate jurisdiction will govern this interpretation of this Contract.

(Ex. P-6)

Ms. Torres testified that the Debtors were told that the wife of an SJB's employee owned a mortgage company, and might be able to help the Debtors obtain a mortgage if they decided to exercise the option.

An unsigned "Addendum to Contract Revised May 16, 2007", was also submitted into evidence. (Ex. P-7). The addendum provided:

1. The sum of $65,000 will be placed in an escrow account set up by SJB Holdings, LLC to pay the rent, taxes and insurance for a period of (12) months from the signing of this Addendum;
2. All closing costs shall be paid in full.
3. Carlos E. & Marguerite M. Torres shall receive the amount of $150,000 at time of closing;
4. SJB Holdings, LLC agrees not to obtain a second mortgage on the property located at Boonton, New Jersey;
5. Carlos E. & Marguerite M. Torres may apply for a mortgage, with no money down, prior to the lease ending, which mortgage shall commence twelve (12) months after the signing of this contract.
6. Carlos E. & Marguerite M. Torres shall be entitled to a copy of the appraisal performed on the property located at Boonton, NJ.
7. If, at any time during the initial (12) month period from the signing of this agreement SJB Holdings, LLC dissolves, Carlos E. & Marguerite M. Torres reserves the right to purchase the property located at Boonton, NJ, per the terms of the original agreement.
8. This addendum overrides all previous contracts.

Carlos E. & Marguerite M. Torres              SJB Holdings, LLC

The addendum provided that $65,000 of the proceeds from the sale to Wilson would be placed into an escrow account set up by SJB to pay rent, taxes and insurance for a period of 12 months from the signing of the addendum. The addendum, although not signed by the Debtors, stated that the Debtors would receive $150,000 at closing, an amount that Ms. Torres testified that she negotiated for after an initial offer of $100,000. The addendum did not disclose the amount that SJB was to receive at closing, nor the amount that would be available for distribution. Ms. Torres testified that there were no negotiations with Mr. Wilson or anyone else at SJB regarding the amount of rent to be paid. As to the $150,000.00 figure, Ms. Torres said that "the figure that we had basically I say negotiated with them that we would be given in exchange for, you know, they're going to take over the house and pay off the balance on it and we would be given $150,000.00". (Tr. 8/12/15 at 53). Ms. Torres testified that at the time the Debtors were engaged in negotiations with SJB no one from SJB disclosed to the Torreses the dollar amount to be paid to SJB from the transaction, nor did Ms. Torres have an understanding of how much proceeds from the sale would be available for distribution to the parties. (Tr. 8/12/15 at 53). Ms. Torres claimed that she never signed a document authorizing distribution to SJB of any portion of the sale proceeds, other than the reservation of $65,000.00 under the "Addendum to Contract". The addendum provided in part: "Carlos E. & Marguerite M. Torres may apply for a mortgage, with no money down, prior to the lease ending, which mortgage shall commence twelve (12) months after the signing of this Contract." (Ex. P-7). Ms. Torres testified that she never had discussions with anyone at SJB regarding the mechanics of applying for a mortgage.

On June 11, 2007, the closing on the sale of the Property to Wilson occurred at the offices of Woodbury Title. Mr. and Ms. Torres attended the closing. According to Ms. Torres, Mr. Wilson was there, as well as Chris Rosely, and other people working at the Woodbury Title

office. Ms. Torres testified that she had no opportunity to review the documents before she signed them, was not represented by an attorney, and no one explained or described the nature of the documents to her. At closing she did not recall signing any document that she had the right to counsel, that Woodbury Title did not represent her, nor did Velahos represent her.

The Settlement Statement (the "HUD") reflected a sales price of $625,000. (Ex. P-8). Of those proceeds, according to the HUD, $219,185.04 would be used to pay off the Debtors' mortgage held by Citimortgage Inc., and $401,698.27 was listed as "cash to seller." Ms. Torres testified that she did not know at the time of the closing whether or not those proceeds of $401,698.27 were available to her. Tr. 8/12/15 at 62. The only proceeds recovered by the Debtors was a check for $150,000. (Ex. P-16). An additional check jointly payable to the Debtors and SJB for $251,773.27 appears to have been endorsed by both Debtors over to SJB. Ms. Torres testified that neither she nor her husband received the check and never signed the check, and did not know SJB would be receiving any money. Tr. 8/12/15 at 67.[4] The HUD does not reflect a disbursement to SJB. Also presented was a deed dated June 11, 2007, prepared by Velahos between the Debtors as grantor and Wilson as grantee. (Ex. P-9). Ms. Torres testified that she did not recall meeting Velahos.

---

[4] The testimony of Ms. Torres was as follows in questioning by counsel for the Trustee:
Q If you could just focus on the top check.
A There's a check here made out to Carlos E. Torres and Marguerite M. Torres in the sum of $251,773.27.
Q Okay. Did you endorse that check?
A We never received a check made out to us.
Q Okay. Hold on. Hold on.
A Yeah.
Q I'm just asking you if you're endorsing it, your signature appears on the check on this exhibit.
A I know it seems to be the signatures, but we never got one. We never signed it.
Q Okay. At the closing did you have an understanding that SJB would be receiving $251,773.27?
A No.
Q No one told you that?
A No, no one told us that, but we never received this check ever.
(Tr. 8/12/15 – p. 67, l. 9-24).

Ms. Torres stated that neither she nor her husband ever attempted to exercise the option to purchase the Property, and vacated the Property on or around December 2008. Debtors subsequently closed their business due to continuing financial and health troubles, and the Debtors filed for bankruptcy. Ms. Torres testified that she did not become aware of equity not realized in the house until advised by the Trustee.

First American next cross-examined Ms. Torres. Ms. Torres claims she only learned of the money she was meant to receive from the HUD-1 Settlement Statement after meeting with the Trustee. During that meeting, according to Ms. Torres, the Trustee indicated that the Debtors might be able to recover some of the funds owed to them if the Trustee was successful in this action.

Ms. Torres indicated that the appraisal she received seemed accurate to her, but that she did not attempt to sell the Property because it needed repairs prior to selling. Ms. Torres later read in the local paper that Wilson ultimately sold the Property for $400,000.

Although Debtors received $150,000 for sale of the Property, Ms. Torres conceded that that figure does not appear on the Settlement Statement, and that the CitiMortgage mortgage of $219,185.04 was paid off during the sale, so that the Debtors received the benefit of some $369,000. Wilson ultimately sold the Property for less than the new loan he took out of $531,250.00 (Ex. P-8). Under the Residential Lease-Purchase Agreement, the option to purchase price given to the Debtors was that same amount - $531,250.00 (Ex. P-6). The Debtors did not wish to buy the Property at the agreed-upon price from Wilson.

Ms. Torres stated that she remained in the Property until December 2008, approximately 18 months after the sale of the Property to Wilson. During that time, Ms. Torres remained in contact with Wilson, but never attempted to unwind the deal. During that time, the Debtors did

not pay any rent, insurance, or real estate taxes, although Ms. Torres indicated that all those costs were factored into the rental agreement with Wilson.

The Debtors received $150,000, which according to Ms. Torres, she negotiated up from an initial offer of $100,000. Ms. Torres noted that she received inquiries from two other similar businesses, offering to help the Debtors out of the foreclosure situation but she never spoke with those businesses. She testified that she believed Wilson and the Defendants were honest and fair until she spoke with the Trustee. Ms. Torres also testified that she understands the Trustee is not her attorney, but rather represents the bankruptcy estate. Ms. Torres testified that her motivation here is to seek redress against parties who in her opinion perpetrated a crime against her and her husband. Ms. Torres testified that at closing the Debtors anticipated receiving $150,000.00 as a result of the sale. As to the $251,773.27 check, Ms. Torres also testified that although the signatures look very similar to her husband and her signatures, she never endorsed the check, and never saw the check. Therefore, Ms. Torres believes "someone did something with this check because we never received it." (Tr. 8/12/15 at 91).[5]

---

[5] The testimony of Ms. Torres was as follows in questioning by counsel for First American:

Q -- the check in the amount of $251,773.27, do you see that?
A Yes, I do.
Q All right. Is it your testimony that you did not -- that's not your signature on the back of that check?
A This check never happened, not to us.
Q All right.
A The signatures look very similar to my husband's and mine,but we did not get this check and we did not cash any check other than the one for the 150,000. I don't know how this was done, but knowing all the stuff that was done to us, I have no thoughts about that they would put our signatures on these checks --
Q All right. Do you know --
A -- because I never even saw this check.
Q Do you know of anyone who has forged your signature previously?
A No.
Q Do you know of anyone who has forged your signature after the closing on June 2008 --
A Well, obviously this --
Q -- 2007.
A Obviously somebody did something with this check because we never received it.
Q The question is not whether you received it. The question is whether you signed it, Ms. Torres.
A No.
Q You didn't sign P-15?

On re-direct, Ms. Torres noted that she never had a conversation that two checks should be cut at the closing. The Trustee also represented that he advised Ms. Torres that she may have an exemption claim, pending the outcome of this litigation.

Next, Wilson, a former defendant in the present matter, testified, beginning with questioning from the Trustee. Wilson previously worked at Integrated Financial Group in Mount Laurel, N.J. as a sales consultant soliciting mortgages over the phone. Next he worked at Clearview Consulting as a mortgage solicitor, then he worked at American Home Lending, a company owned by Donna Fisher, Brian Mammoccio's girlfriend, where he helped borrowers to obtain mortgages from other lenders.

Mr. Wilson left American Home Lending after only a few months, to open his own company with Brian Mammoccio, whom he met during his tenure at American Home Lending. In 2006, Mr. Wilson opened SJB with Brian Mammoccio, former President of American Home Lending, which was created for the purposes of property management, and investment in properties. SJB would purchase properties, manage the properties, invested in properties, and fix up properties. Mr. Wilson and Mr. Mammoccio each owned 50% of the company, and also served as the company's decision-makers. Aside from Mr. Wilson and Mr. Mammoccio, SJB had two or three other employees, including Chris Rosely, a sales consultant. Wilson testified that he knew Mr. Velahos as an attorney at Woodbury Title and owner or co-owner of the company and was introduced to him by Brian Mammoccio. He also identified Pamela Abrams and Holly Lewis as title clerks at Woodbridge Title.

---

A No, and we were incidentally not given any checks to sign that we know of. Somehow somebody else had to receive this money, but we never were given another check.
Q Okay. But it looks like your signature?
A Yes.
(Tr. 8/12/15 - p. 90, l. 23-p. 92, l. 5).

SJB's business model, according to Wilson, was to invest mostly in single-family homes in pre-foreclosure, where the bank has not taken possession. SJB found the homes through a website called RealtyTrac, which gave SJB information regarding the homes in pre-foreclosure. The main criteria in determining whether to invest in a home was whether SJB would be able to resell the home, which was dependent on the condition of the property and the equity the current homeowners had.

SJB's practice was to solicit business by mail to all homes indicated as being pre-foreclosure in New Jersey. After speaking with homeowners on the telephone, members of SJB including Wilson, Mammoccio and Chris Rosely, would meet with the homeowner at the property and inspect the premises, and then would attempt to make a deal with the homeowner for sale of the property, with a lease-purchase agreement to attempt to sell the property back to the homeowners.

Because SJB was a new company without much credit, the company invested in properties in individual names. The investors for SJB included Mr. Wilson, Gina Wilson, his wife, Jim Morrison, Dawn Morrison, and Pat Adams. SJB did invest in a couple of commercial properties in its own name. Investors would take title to the property in his/her own name, using their own credit. Initially, Wilson purchased all the properties, but eventually branched out to use other investors because the lending guidelines changed, limiting the number of homes that could be mortgaged under one person. Investors were paid for serving as the investor up front, with the amount on a single family home determined by Mr. Wilson and Mr. Mammoccio, which payment was usually $12,500. Wilson testified that in some instances SJB contributed funds for the investor to contribute to the purchase of the property. Wilson testified that he purchased 17 properties as an investor for SJB and received a salary from SJB of $10,000 per month.

Wilson testified that form real estate sale contracts, separate lease agreements and addendums were prepared by SJB. Typically, there were escrows for principal, interest, taxes and insurance for a 12-month period.

Wilson testified that after the sale to the investor the seller, the prior homeowner, would retain possession of the property, subject to a lease-purchase agreement. SJB also indicated that it could help the homeowners to obtain a mortgage after the 12-month period. According to Wilson, in a typical transaction SJB was paid "with the funds from the settlement outside of any negotiations made up front, funds to the seller." (Tr. 8/12/15 at 115). SJB received those funds at the time of settlement. Wilson indicated that Woodbury Title was the only title agency that SJB utilized in New Jersey to close transactions, but SJB used several others in other states.

Wilson testified that SJB operated for three or four years, from 2006 to until approximately 2009, when it was dissolved. SJB maintained a list of properties in which it invested, which was maintained by Wilson. (Ex. P-24). Wilson indicated that of the approximately forty properties purchased by SJB and its investors, he believed two of the prior homeowners repurchased the property, and approximately 20 to 25 properties were lost to foreclosure. After the properties were purchased by the investors, SJB maintained the mortgage payments. Wilson indicated that SJB stopped making the mortgage payments on properties in his name in January 2008, and at the end of 2008 for properties not in his name; the mortgage payments were stopped when the prior homeowners stopped making rent payments, or left the properties.

While SJB operated, it utilized American Home Lending, owned by Donna Fisher, to handle the mortgages on the properties until Mammoccio left SJB in 2007.

After SJB was dissolved, Wilson opened JWB Holdings in September of 2007, and operated under that name until 2009. The business was of the same type as SJB property management and used similar documents as SJB, with the addition of an additional form outlining the proceeds the prior homeowners were meant to receive at closing. JWB invested in six or seven properties, and used Woodbury Title on the closings in New Jersey. JWB was also paid in the same method as SJB. The properties that JWB invested in were all either sold at short sales or went to foreclosure; no homeowners repurchased their properties.

Wilson testified that he is no longer working in the property management field. Wilson testified that he has been involved in two previous lawsuits relating to SJB, but both were settled out of court. The State of New Jersey contacted him informally and, with the assistance of an attorney, he settled matters related to SJB. Wilson testified that after Brian Mammoccio left SJB in August 2007 Mr. Mammoccio went into a similar business which operated under the name of New Hope Property LLC, a N.J. LLC, located in Bellmawr, N.J. (Ex. P-45).

The Trustee presented a "Superceding Indictment" filed in the United States District Court for the District of N.J. *United States of America v. Brian Mammoccio* (Ex. P-45) concerning Mr. Mammoccio's activities in connection with New Hope Properties. SJB and "JW" are mentioned in Count 2 of the indictment sounding in tax evasion. *Id.*

The Trustee noted that Mammoccio pled guilty in a prior action concerning conspiracy to commit wire fraud with respect to Mammoccio SJB's transactions. Wilson filed for bankruptcy protection in New Jersey in 2014, and has since received a Chapter 7 discharge.[6]

Wilson testified regarding the transaction in question in the instant Adversary Proceeding. Wilson first communicated with the Debtors by sending them mailings, as SJB routinely did. This led to further communication by telephone and a visit to the Property by

---

[6] *In re James B. Wilson and Gina Marie Wilson*, Case No. 14-17372 (Bankr. D.N.J.)

Wilson, Mammoccio, and possibly Chris Roesly, a sales consultant with SJB. Wilson served as the investor for the Debtors' Property. Wilson did not recall how the purchase price was set for the subject property but testified that SJB typically established sale prices for properties through appraisals, or certain websites such as Zillow that would provide valuations for properties.

Wilson testified that he did not provide a deposit for the transaction. Wilson also indicated that the sales contract was negotiated between Wilson, Mammoccio, and the Debtors. The contract, which was supplied to Wilson's mortgage lender, did not contain a tenancy addendum, and did not indicate that it was subject to a lease agreement. The lease-purchase agreement was prepared by Mammoccio and Wilson; it indicated that the monthly rental obligation would be $0, and that the tenants would be responsible for all repairs so if repairs were required they would not come out of the escrow. Wilson noted that the lease-purchase agreement was not provided to his mortgage lender. The option price of $531,250, in the lease-purchase agreement, appears to be the amount of Wilson's loan, and the Debtors would keep any equity above that amount. The Trustee also questioned Wilson as to the "Addendum To Contract" the terms of which according to Wilson were set by himself, Mammoccio and the Debtors, which indicated that Debtors would be given a check for $150,000 at closing. Wilson stated those were the only funds the Debtors were to receive at closing, but does not recall whether Debtors were advised of the amount of net proceeds available for distribution at closing or the amount SJB would receive at closing. Nor was this information in the documents. The addendum was not provided to Wilson's mortgage lender. Wilson noted that these three documents were the only three signed and exchanged between the parties, but that none of the documents discussed or authorized additional disbursement to SJB at closing other than the $65,000.00 escrow to be set up by SJB for 12 months of rent, taxes and insurance.

At closing, Wilson provided a personal check from his checking account at Commerce Bank to Woodbury Title in the sum of $112,208.37 (Ex. P-12). The closing occurred on June 11, 2007. Wilson acknowledged there was a check made out jointly to Debtors and SJB from Woodbury Title, for approximately $251,773.27 at the closing (Ex. P-15); Wilson testified that the Debtors endorsed the check over to SJB, and the check was subsequently deposited in SJB's bank account. Wilson does not recall having a discussion with Woodbury Title regarding the disbursement of two checks, and is not aware of any documents by the Debtors which would authorize two checks to be cut. Wilson identified certain "Closing and Disbursement Instructions" regarding this transaction. (Ex. P-11).

Next, counsel for First American cross-examined Wilson. Wilson testified that he was not trying to steal money from the Debtors nor defraud the lender here. Wilson also testified that while the closing statement indicated "cash to Seller" of $401,698.27, it was contemplated and agreed that Debtors would receive $150,000 at settlement from this transaction and that "if they (The Torreses) received the entire portion of the $401,690.27 and had zero payments rent for a year that would be --- means[sic] that I would give them free rent for a year. The agreement was to receive $150,000 at settlement, which we agreed upon." (Tr. 8/12/15 at p. 163.) Wilson testified that the money SJB received from the transaction, $251,773.27, represented 12 months of payments, including principal, interest, taxes and insurance, the $65,000.00 escrow and SJB's fee. The fee was generally 20% of the property value, which here was approximately $120,000. (Tr. 8/12/15 at p. 163-165.) The check endorsed to SJB was deposited at Commerce Bank that same day.

After the closing, Wilson stayed in contact with Ms. Torres; Ms. Torres indicated that she would not be able to repurchase the Property, and that her husband "took the $150,000 and left."

Wilson indicated that he did not receive any complaints from Debtors during that time regarding the transaction. Wilson executed a Uniform Residential Loan Application on the date of the sale (Ex. D-1) and contemplated borrowing money from American Home Lending previously used to obtain mortgages for other properties. The loan Wilson received for this Property was from Credit Suisse Financial Corporation for $531,250. Wilson executed an Adjustable Rate Note dated June 11, 2007 in favor of Credit Suisse Financial Corporation in the amount of $531,250.00 (Ex. D-37) Wilson also executed a mortgage that secured the Note (Ex. D-4) recorded as a lien on the Boonton Property. The document was notarized by Pam Abrams. SJB made payments on this loan, and then in August 2007 when Mammoccio left the company, Wilson began making the payments personally for four months.

According to Wilson, when the year ran on the Torreses' lease, Ms. Torres indicated she would not be re-purchasing the property, Wilson informed her that he would list the Property for sale, and that she could stay in the Property during that time. The Property was then listed with a realtor, and sold at a short sale, which satisfied Wilson's personal obligations on the Note. Wilson testified that at the time of the closing of the short sale, the realtor involved indicated that the value was fair; the Property was sold on October 20, 2009 to Michael Elliott for $400,000. (Ex. D-7).

On re-direct, pursuant to the Trustee's questions, Wilson acknowledged that the Debtors did not sign a written agreement disclosing the 20% fee SJB took from the sale of the Property.

Next, the Trustee called as a witness Nancy Brown ("Brown"), Vice President and Lead Senior Claims Counsel at First American. The Trustee questioned Brown, First American's Rule 30(b)(6) witness, as to the April 15, 2004 Agency Agreement between First American and Woodbury Title (Ex. P-21). Brown testified that the agency agreement provides for a contractual

relationship between the parties. The agency agreement became effective when Woodbury Title became a title agent for First American, and was terminated in October 2007. Brown testified that First American was aware that during that time Woodbury Title was conducting real estate closings. First American designated an agency representative for Woodbury Title, who would make visits to Woodbury Title from time to time, would conduct audits, and would create "agency review reports" between February 23, 2005 and September 21, 2007. (Ex. P-44). Brown conceded that the reports indicated that Woodbury Title was conducting real estate closings and closing transactions through its accounts at Commerce Bank, later TD Bank. Another underwriter used was Chicago Title identified in the reports as "minimal volume". (Ex. P-44). Brown testified that she was aware of the practice in South Jersey of title agents conducting real estate closings.

Brown testified that part of the function of a title agency is to issue title commitments, a contractual document which indicates that if the underwriter's requirements are met then a policy will be issued to the proposed insured on a real estate transaction on specific property, subject to exceptions, exclusions, conditions and stipulations. Woodbury Title issued title commitments toward the issuance of First American policies, as well as title insurance policies with First American as the carrier. Brown described a title insurance policy as a contract between First American and the named insured in regard to a certain piece of property. The agency contract dictated whether Woodbury Title needed First American's authorization to issue a title insurance commitment on any given property. First American was paid 15% of the title insurance premium from Woodbury Title. Brown also identified a 2008 "Agency Procedures Manual" pertaining to First American's relationship with its agent. (Ex. P-43).

The Trustee further questioned Brown as to the termination of the agency agreement as well as her personal knowledge of the closing transaction in question. Brown testified that she was not involved in the underlying transaction, nor was First American and any knowledge she has regarding these matters has been obtained through review of documentation since the commencement of the litigation.

The Trustee next questioned Brown regarding provisions of the Agency Agreement between First American and Woodbury Title. (Ex. P-21). Under Section J, "During the term of this Agreement, Agent will not act as agent for the Business of Title Insurance for any other title insurance company other than the insurer, unless first approved in writing by the insurer, and only to the extent so approved." (Ex. P-21, Agency Agreement, Section J). Brown said she saw nothing in First American's files to indicate approval to Woodbury Title to write for any other carriers. Brown testified that as to the indemnification provision of the Agency Agreement Paragraph 13 provides that the agent is liable when the agent has not complied with the terms of the agreement, rules, regulations or specific instructions given to agent; another provision provides the agent is liable to insurer for all lost costs or damages including attorney's fees which insured may sustain or become liable for on account of any dishonest, fraudulent, malicious, criminal, or grossly negligent act by agent or its employees or parties hired by an agent in connection with either the issuance of an abstract of title, binder, Commitment to Insure, Policy of Title Insurance, a closing by the Agent, its employees or its independent subcontractors involving the issuance of a policy of the insurer, escrow loss occasioned by agent's failure to properly disburse such funds, or close in accordance with escrow instructions or where escrow funds are misappropriated by the agent, its officers or employees. Tr. 8/12/15 at pp. 194-195.[7]

---

[7] Paragraph 13 of the Agency Agreement provides:

Brown testified that her understanding of title insurance is that any liability of First American is only in connection with the title insurance policy.[8]

The Trustee next presented Brown with the HUD-1 for the transaction in question. Brown indicated that Wilson was required to bring cash of $112,208.37 to the closing, and the balance of the purchase price was financed through a loan. Brown also indicated that the cash to seller, as indicated on the HUD-1, was $401,698.27, and that the closing statement does not indicate any funds due to Wilson or SJB in connection with the transaction. The closing statement was signed by Pam Abrams of Woodbury Title as "settlement agent". Woodbury Title

---

INDEMNIFICATION
Agent shall be liable to Insurer for all loss, cost or damage including attorney's fees and other costs, which Insurer may sustain, or become liable for on account of:

BREACH OF CONTRACT
   A. Failure of Agent to comply with the terms of this Agreement or with rules, regulations, and .instructions given to Agent by Insurer.

FRAUD.NEGLIGENCE,ETC.
   B. Any dishonest, fraudulent, malicious, criminal or grossly negligent act, whether by Agent or by Agent's employees or parties hired by Agent, in connection with either:
      (1)   The issuance of an abstract of title, binder, Commitment to Insure, or Policy of Title Insurance or other evidence of title of the Insurer; or
      (2)   A closing by the Agent, its employees, or its Independent sub-contractors involving the issuance of a Policy of the Insurer.
      {3)   Agent may, at its election, pay any and all claims brought against it under terms of this section, and shall then be subrogated to the rights of Insurer with respect to same.
      (4)   Escrow loss limited to losses occasioned by Agent's failure to disburse properly or close in accordance with escrow Instructions, or where such escrow funds are misappropriated by Agent, its officers or employees.
   Agent's liability to Insurer for ordinary negligence shall not exceed the amount of liability insurance required to be maintained under the provisions of paragraph 2 G of this Agreement.

[8] The testimony of Ms. Brown was as follows in questioning by counsel for the Trustee:
Q Okay. Paragraph 4 doesn't limit the indemnification to the issuance of a title policy?
A It doesn't refer to the policy in that paragraph but the only basis on which First American has a concern about the closing is either in regards to the issuance of a closing service letter to a lender, which provides protection to a lender, or a policy in which First American has a responsibility potentially to a named insured.
Q When it refers to in accordance with escrow instructions, is that referring to instructions from the lender as to how to conduct the closing?
A By and large that would be the instructions from the lender if there's a lender in the transaction and the lender's to be insured. Even the closing service letter is only applicable when there's a policy to be issued by First American. (Tr. 8/12/15 - p. 195, l. 13-p. 193, l. 3).

issued a title insurance commitment in connection with this transaction, with First American as the title insurer. (Ex. P-22). Brown further testified that a title insurance policy was issued in connection with the transaction. (Ex. P-23). In 2009, Brown sent an internal email to various individuals at Frist American including underwriting counsel regarding Wilson, Mammoccio, SJB, and JWB, asking that those persons/entities be put on a "non-attorney watch list." Brown indicated the email notified the underwriters that two claims had been filed regarding the parties, to question whether First American wanted to continue to do business with those entities, because they were "risky individuals," characterizing their business practice as "foreclosure rescue schemes." (Ex. P-47).

At the second day of trial on August 24, 2015, the Trustee sought to read into the record portions of a deposition of Mr. Velahos. First American argued that although Velahos indicated that he was not appearing the Trustee had not shown Velahos's unavailability. The Trustee conceded that he did not subpoena Velahos. The Court pursuant to Fed. Rule Evid. 804(a)(5) and *Rodriguez v. Hayman*, 2013 WL 1222644 (D.N.J. March 25, 2013) denied the Trustee's request to read Velahos's testimony into the record, noting that there has been no showing of reasonable means to procure Velahos, and therefore the Trustee has not shown Velahos's unavailability.

Finally, the Trustee sought to read portions of an April 19, 2012 deposition of Holly Lewis ("Lewis") into the record. Ms. Lewis is a resident of Ohio, more than 100 miles away, and therefore qualified as unavailable pursuant to Fed. Rule Evid. 804(a)(5) to testify at this proceeding. *See Wilson v. Seven Seventeen HB Philadelphia Corp. No. 2*, No. CIV. A. 99-CV-1729, 2003 WL 22709073, at *4 (E.D. Pa. Nov. 14, 2003).

Lewis testified that she received a GED in 2001 and her New Jersey Title Producer's License in 2006, and worked at Woodbury Title from the end of 2005 to 2008 starting in "processing" which involved orders and paying off taxes, and clearing title. She became a "closer," which is similar to a settlement agent or an office manager, when she received her title license. As part of her employment with Woodbury Title as a closer, Lewis would determine that title was clear, get the closing documents, input figures into the HUD, disburse the checks, and arrange for the notarizing of documents. Approval of the HUD was then sought by the lender, and any changes made to the HUD needed approval from the lender; Lewis indicated that HUD approval by the lender was necessary to close.

Lewis also indicated that if there was a problem or issue she went to Velahos as owner of Woodbury Title but she did not have a daily supervisor. She also testified that Pam Abrams might look the HUD over if there were issues or concerns, but generally, if everything was in order, no one else would review the HUD or disbursements. Lewis was responsible for entering the borrower's information as well as figures and fees into the HUD. She indicated that there was software which pulled checks to be distributed from the HUD, and that someone would have had to modify the name of the payee on the HUD to create a disbursement to SJB.

Lewis testified that, although she did not remember the particulars of the closing in question, if the name of the payee on the check was modified to add SJB, someone would have modified the name of the payee in order to add SJB along with the Torreses. Lewis testified that in this particular case she would have altered the disbursements "by the request of the sellers". Tr. 8/24/15 at 21. Usually, such a request would have to be in writing, but because the check was being issued jointly to the Debtors and SJB and the Debtors were signing the check over to SJB, that request may not have been in writing. Lewis noted the sellers (the Debtors) received

the entire amount indicated on the HUD as represented to the lender, but signed a portion of the sale proceeds over to SJB. Lewis testified that usually a buyer does not usually receive a portion of the sales proceeds at closing, but she did not question the transaction because the Debtors, as sellers, signed over the money to SJB.

Lewis stated that she has worked on a few other transactions involving Wilson before the transaction in question because he worked at a mortgage company that utilized Woodbury Title often, but did not recall working on any other transaction where Wilson was a buyer.

Lewis testified that she was involved in the subject transaction in preparing the HUD and issuing the checks, but stated that she was not present at the closing table, but in the office when the documents were signed. Instead, Ms. Pam Abrams, attended the closing of this transaction as the settlement agent and notary. Lewis noted that prior to the closing, the buyers and sellers do not receive the lender's documents, the "closing package." Woodbury Title does not receive the closing package needed to create the HUD, until the morning of the closing, or even just a few hours before the closing. Therefore, if the parties do not request the closing package and HUD prior to the closing, they will not receive those documents until the closing.

Lewis testified that it was not standard for a closing to occur after 5:00 p.m., but that Woodbury Title will remain open for a closing after normal business hours if that is when the parties are available. Lewis also testified that Woodbury Title did a lot of work with American Home Lending, where Wilson was a loan officer, and that she assumed Wilson used Woodbury Title for this transaction because Woodbury Title often worked with American Home Lending.

Lewis stated that she likely prepared the deed for this closing, which was typical in her employment. (Ex. P-9). Lewis signed the deed for Velahos, the owner of Woodbury Title, based on his verbal authorization, which she did multiple times, as well as check 4786, the June 11,

42

2007 check in the amount of $251,773.27 payable to the Debtors and SJB Holding. (Ex. P-15). Lewis noted that as a closer, she was responsible for ensuring the lender's closing instructions were complied with, and that any changes to the closing instructions, including the amount to be disbursed or the recipient, must be approved by the lender before a closing can occur.

Lewis testified that she was unaware of any documents that authorized Woodbury Title to act as settlement agent on behalf of either the seller or buyer. Lewis further testified that, based on her review of the file, she did not remember whether there is a document whereby the Debtors acknowledged their right to be represented by independent counsel. Lewis also testified that no one at Woodbury Title oversaw the disbursement process, although in closing she would physically prepare the checks.

Lewis next indicated that although she does not recall, she assumes she received the personal check that Wilson brought to the closing. Lewis said it was not usual to accept a personal check, and one would have obtained lender approval to accept the personal check and would have had to call the bank to verify the funds were there before accepting the check. Lewis noted the check was deposited into Woodbury Title's account and cleared on June 13, 2007 and that other checks in connection with the closing cleared before Wilson's check cleared.

Lewis next noted that the file does not contain any documents to the sellers advising them that Woodbury Title did not represent their interests, and that was not the ordinary practice of Woodbury Title.

Lewis noted that, in her time employed at Woodbury Title from 2006 to 2008, and her participation in over 1000 closings with Woodbury Title, it was her experience that normally a buyer did not receive funds at closing other than those designated on the HUD-1, but that might occur if there was an overpayment or a fee changed.

43

Finally, the Trustee read Lewis's testimony regarding First American's insurance policy into the record. Lewis noted that First American was the title insurer for the transaction, and that a First American title insurance policy was issued at closing.

The Trustee again requested entry of default against Woodbury Title, and urged that entry of default for fraud and conspiracy does not require testimony of an expert. First American claimed there was a failure to show proof of fraud in this matter and no showing of damages, i.e., the value of the subject property, no appraisal, no title expert. The Court reserved decision as to whether there is a sufficient basis in this record for entry of default or default judgment, and determined it would review the record based on the Court's independent assessment as to whether the standard for default and default judgment has been met. The Court allowed into the record (Ex. P-45), a "Superceding [Criminal] Indictment" against Brian Mammoccio filed in the United States District Court for the District of New Jersey.

The Trustee then rested, and First American requested judgment in its favor under Fed. R. Civ. P. 52(c). First American argued that the parties have been proceeding in this case under "no recognized cause of action," and indicated that there has never been a claim by a seller against a title insurance underwriter arising out of a real estate transaction. Counsel for First American argued that he understood that the issue to be tried was the distinction between an agent independent contractor, and the possibility of Woodbury Title being considered a species of employee agent under the law, and that all that has been established is that there is an independent contractor relationship between First American and Woodbury Title that is embodied in the agency agreement, and that there has been no showing of any other relationship or proof that First American had knowledge of these events at any material time. First American agreed that as to an independent contractor relationship, case law provides that the principal,

First American, is only vicariously liable for actions of the agent if it directs the agent or otherwise actively participates, which First American did not do. First American urged that this case is counter to the structure of title insurance in the state of New Jersey, and that there has been no showing that this transaction should not have closed as an insured transaction and only events subsequent to the closing have given rise to the litigation.

The Trustee argued, in opposition, that Debtors were never told they were entitled to more money than they received at closing here another $251,773.27 in addition to the $150,000.00 received by the Debtors, and that is why the litigation only arose after the transaction closed. The Trustee further argues that knowledge and participation of the principal are not elements of vicarious liability, and the Trustee does not dispute that First American did not have knowledge and did not participate in the fraud. Instead, the Trustee urged that the record established that Woodbury Title was an agent independent contractor under the agency agreement. The Trustee argues that there must be a showing of a fiduciary relationship and power to bind, which is shown by the agency agreement as Woodbury Title was permitted to originate and solicit applications for title insurance and issue commitments to insure and issue and countersign policies of title insurance on behalf of First American, which demonstrates the power to bind, and that the agency agreement itself defines Woodbury Title as "agent", and the insurer First American as principal which creates a fiduciary relationship. The Trustee urged that this is not a title claim but sounds in <u>tort</u>. The Trustee argued that with regard to the fiduciary relationship, the agency agreement defines Woodbury Title as agent, the insurer as principal and that informs the relationship of confidence required to establish the existence of a fiduciary relationship and power to bind. The Trustee further argues that Woodbury Title is an agent independent contractor and its employees are subagents of Woodbury Title, and that case

law provides that a principal can be liable for the misrepresentation, fraud and deceit committed by its principal and might expect would be the subject of representations provided the other party has no notice that the representations are unauthorized, that here American Title knew Woodbury Title was conducting closings, and Mr. Wilson testified that critical information was withheld from Ms. Torres and she did not know that these omissions may have been unauthorized.

The Trustee further relied on *In re Curriden*, 2007 WL 2669431, which the Trustee urged found two different bases for vicarious liability: (1) agents acted within the scope of agency relationship even though specific conduct was not authorized; and (2) agents and sub-agents (employees) were acting outside the scope of the agreement, but were aiding in accomplishing the torts by the existence of the agency agreement. The Trustee argues that the record here presents ample evidence for the Court to consider the Trustee's claims against First American, and that the Complaint should not be dismissed as against First American. The Court determined to have the motion to dismiss submitted to be determined after the close of evidence.

Next, First American presented its defense, with the testimony of Ms. Nancy Newman Brown, who testified that she has been employed by First American for approximately seventeen years, and has been in the title insurance business for approximately thirty-eight years. Ms. Brown is an attorney, and a member of the New Jersey Bar since 1976.

Brown testified as to the April 15, 2004 Agency Agreement between First American and Woodbury Title (Ex. P-21), which she testified is the only current contractual agreement between the two companies. Previously there was a National Agency Agreement between the two companies. Brown testified that First American has agency agreements with all its independent agents, and that it had no ownership interest in Woodbury Title. Brown testified

that Woodbury Title was a licensed insurance producer in New Jersey "insured by the New Jersey Department of Banking and Insurance."

Brown testified that First American does not supervise the day-to-day activities of its agents, but conducts periodic audits, or agency review reports. There is no indication of specific files reviewed including of this particular transaction in these reports. Instead the audit review reports included random sampling of files.

The contract between Woodbury Title and First American was terminated by a termination letter in August 2007, which went into effect 60 days later in October 2007. According to Brown, the relationship was terminated because First American was not receiving a lot of premium dollars, there was a small claims history, and the audit review reports indicated Woodbury Title was not reconciling its accounts. Ms. Brown testified that the first claim involving Wilson as a buyer and Woodbury Title, came to First American by notice of the *Thurber* litigation, <u>after</u> the agency relationship was terminated in 2007. *See Thurber v. Thurber*, BUR-L-2467-08 (N.J. Sup. Ct. Law Div. Aug. 17, 2009) (Ex. D-9).[9]  Ms. Brown testified that First American received notice of the *Thurber* litigation on April 18, 2008 (Ex. D-8), and that the legal claim in the *Thurber* litigation brought against First American was not based on any policy as the plaintiff in that case, Linda Thurber, was not a named insured. Similarly, here the Debtors were not named insureds on any policy issued by First American. Brown noted that First American's position is that there is only liability to insureds, the only exception being the closing service letter and that the agency contract only authorizes the agent to solicit title insurance or applications for title insurance or issue commitments, and policies and endorsements on First

---

[9] As discussed *infra*, on January 17, 2017, the Appellate Division affirmed the trial court in an unpublished decision. *See Thurber v. Thurber*, No. A-4578-14T4, 2017 WL 164480, at *7 (App. Div. Jan. 17, 2017), *cert. denied*, No. 078935, 2017 WL 2098911 (N.J. May 5, 2017).

American forms.  So the agency contract only contemplates a contractual relationship between the company based on the agent being able to issue company insurance forms.  With regard to indemnification owed by an agent under an agency agreement, First American recognizes a distinction between policy and non-policy claims.  According to Brown the only conduct of a closing that First American is concerned about is conduct that can create liability under a closing service letter or under a policy of title insurance issued by the company.  On non-policy claims, the title agent does not owe indemnification to First American.

Brown testified that the *Thurber* claim was dismissed on summary judgment in favor of First American, but was as of the trial date here on appeal.  The Court took judicial notice of the August 17, 2009 order of New Jersey Superior Court Judge Charles Little, J.S.C. granting summary judgment in favor of First American and others. (Ex. D-9).  Brown noted there was at least one other claim related to Wilson as buyer and Woodbury Title involving one Rolando Torres; a claim under a policy of an insured lender where an application to stay a sheriff sale was filed by Torres, claiming Torres and Torres' father were victims of a foreclosure scam perpetrated by Wilson. (Ex. D-10).  First American received notice of this claim on September 9, 2009.  Rolando Torres ultimately withdrew his objection to the sheriff sale and the sale proceeded after restraints on the sale were lifted by order of the New Jersey Superior Court Chancery Division, Morris County dated April 1, 2010. (Ex. D-11).  The *Thurber* claim was dismissed on summary judgment before the Rolando Torres claim was filed.

On cross-examination, Brown conceded that her knowledge of the termination of the subject agency agreement was from a review of the file, and that she has no first-hand knowledge regarding the termination of the agency agreement.

At the conclusion of the hearing, the Court allowed the parties to submit closing statements in writing, simultaneously, and the Court reserved decision.

**_Post-Trial Submissions_**

On October 5, 2015, the Trustee and First American each filed post-trial briefs. _See_ First American Post-Trial Brief, _Stanziale v. Velahos_, Adv. Pro. No. 11-02336, ECF No. 139; Chapter 7 Trustee Post-Trial Brief, _Stanziale v. Velahos_, Adv. Pro. No. 11-02336, ECF No. 140.

<u>Trustee's Post-Trial Brief</u>

The Trustee first argues that any allegations against the defaulting parties should be deemed admitted. Chapter 7 Trustee Post-Trial Brief, _supra_, at 2. The Trustee argues that final judgment by default should be entered against the defaulting parties Velahos, Abrams, Lewis, Woodbury Title and SJB for legal and equitable fraud, civil conspiracy, and aiding and abetting those torts and further that judgment should be entered against First American holding it vicariously liable for the conduct of its agent independent contractor Woodbury Title. _Id._ Trustee contends that he has made out a prima facie case for legal fraud. _Id._ at 3. The basis for Trustee's claim is that Wilson and Mammoccio, acting on behalf of SJB (Wilson 50% owner and Vice-President of SJB), and Abrams and Lewis acting on behalf of Woodbury Title (Abrams conducted the closing as settlement agent and Lewis prepared the checks and disbursed the sale proceeds), concealed the fact that the net proceeds reflected on the HUD belonged to the Torres, and that those proceeds instead would be distributed to SJB without the Torreses' knowledge and consent. The Trustee argues that these material omissions establish a basis for the relief sought. In support, the Trustee relies upon _In re Curriden_, 2007 WL 2669431, at *6. The Trustee asserts that the record established that Wilson and Mammoccio, acting on behalf of SJB, and Abrams and Lewis, acting on behalf of Woodbury Title, intended the Debtors to rely on their suppression

of material facts related to the transaction, the Debtors so reasonably relied on Defendants'
omissions and suffered damages as a result. The Trustee further argues that Woodbury Title
participated in this fraud by disbursing funds inconsistent with the HUD. Trustee argues that
Velahos also participated in the fraud by abdicating his oversight and supervisory duties and
fostering an environment at Woodbury Title where its employees, including Abrams and Lewis,
had freedom to engage in fraudulent conduct without repercussion. *Id.* at 9 (citing *Francis*, 87
N.J. at 15 (director of closely held corporation liable for damages arising from misappropriation
by insiders)). Trustee contends that the Torreses' damages as a direct result of Defendants'
conduct are the loss of title to their property and the loss of funds disbursed to SJB at closing in
the amount of $251,773.27. *Id.* at 8 (citing *Material Damage Adjustment Corp. v. Open MRI of
Fairview*, 352 N.J. Super. 216, 232-33 (Law Div. 2002) (the goal of compensatory damages is to
restore plaintiff to same position it had prior to occurrence of wrong)).

The Trustee also seeks final judgment by default against Velahos, Abrams, Lewis,
Woodbury Title and SJB for equitable fraud. The Trustee asserts that the elements of equitable
fraud (1) a material misrepresentation of a presently existing or past fact, (2) the maker's intent
that the other person rely on it and (3) detrimental reliance thereon by the other person are met.
*Id.* at 11 (citing *Toll Brothers*, 194 N.J. at 254 (citing *Liebling v. Garden State Indem.*, 337
N.J.Super. 447, 453, 767 A.2d 515 (App. Div.), *certif. denied*, 169 N.J. 606, 782 A.2d 424
(2001))).

Plaintiff also seeks final judgment by default against Velahos, Abrams, Lewis, Woodbury
and SJB for civil conspiracy asserting SJB, through Wilson and Mammaccio, and Woodbury
Title, through Abrams and Lewis, acted in concert with each other to effectuate the equity
stripping scheme against the Debtors – including complicity between the parties involving

unauthorized and undocumented disbursements made in a manner inconsistent with the HUD, and the lender's instructions and without knowledge or consent from the Debtors. *Id.* at 11-12 (citing *Curriden*, 2007 WL 2669431, at *8) (That case setting forth "in the simplest terms, the elements of a conspiracy can be broken down to (1) a combination of two or more persons, (2) a real agreement or confederation with a common design, (3) the existence of an unlawful purpose or unlawful purpose to be achieved by unlawful means, and (4) proof of special damages.").

The Trustee also seeks final judgment by default against Velahos, Abrams, Lewis, Woodbury Title and SJB for aiding and abetting fraud and civil conspiracy – asserting that the Trustee has established the existence of an independent wrong, the aider or abettor's knowledge of that wrong and substantial assistance on the part of the aider or abettor to effectuate the wrong. *Id.* at 14 (citing *Landy v. Federal Deposit Ins. Corp.,* 486 F.2d 139, 162-63 (3d Cir. 1973); *State, Dept. of Treasury Div. of Inv. Ex rel McCormac*, 387 N.J. Super. at 481-82).

The Trustee seeks punitive damages against the said Defaulting Parties under N.J.S.A. 2A:15–5.12, asserting that the evidence at trial establishes that the Defaulted Parties' conduct was malicious, wanton and in disregard of Debtors' rights – a scheme intended to deprive Debtors of the equity in the Property and title to the Property. *Id.* at 16 (citing *Tara v. Bob Ciasulli's Mack Auto Mall,* 390 N.J. Super. 557, 567 (App. Div. 2007)).

In support of his vicarious liability claim against First American, the Trustee argues that Woodbury Title acted as an "agent independent contractor" of First American. *Id.* at 17-22 (citing *Lawyers Title*, 361 F.Supp. at 444-49). Trustee notes that Woodbury Title is described in the Agency Agreement as First American's "agent," which according to Trustee, establishes a fiduciary relationship. *Id.* at 22. (Ex. P-21). Trustee also cites to the indemnification provision in the Agency Agreement which provides that Woodbury Title would indemnify First American

for damages assessed against it for a closing performed by Woodbury Title. The Trustee further argues that the express terms of the Agency Agreement gave Woodbury Title the express authority to act on First American's behalf to originate and solicit applications for title insurance and to issue commitments to insure, and to issue and countersign policies of title insurance on First American's behalf. Trustee further argues that Ms. Brown's testimony demonstrates that First America was aware that Woodbury Title regularly conducted closings. *Id.* at 29. Therefore, Trustee contends that Woodbury Title had the express authority to bind First American.

Given the existence of a fiduciary duty and the power to bind, the Trustee asserts that the record demonstrates that Woodbury Title was an agent independent contractor of First American and that there is no requirement in law that First American have directed or participated in the fraud and conspiracy for vicarious liability to attach – as a principal may be liable for the misrepresentations, fraud and deceit committed by its independent contractor-agent, provided the other parties have no notice that the representations are unauthorized. *Id.* at 22-25 (citing *Dymburl v. Rao*, 881 F. Supp., 942, 945 (D.N.J. 1995); *Thompson v. Robert Wood Johnson*, 2011 WL 2446602 (D.N.J. June 15, 2011); *Sears Mortgage Corp.*, 134 N.J. at 346).

The Trustee urges that under the Agency Agreement, there are two alternate bases to impose vicarious liability on First American as principal of Woodbury Title. First, that Woodbury Title, Velahos, Abrams and Lewis acted within the scope of the agency relationship, even though the specific conduct was not authorized. *Id.* at 31 (citing *Sears Mortgage Corp.*, 134 N.J. at 346). Second, even if Woodbury Title, Velahos, Abrams and Lewis acted outside the scope of the Agency Relationship, they were aided in accomplishing the tort complained of by the existence of the agency relationship. *Id.* at 31-32 (citing *In re Curriden*, 2007 WL 2669431, at *13).

The Trustee urges that First American tries to misdirect the Court's attention from the fact that the Trustee's claims sound in tort <u>not</u> contract and that First American relies on case law providing that as a matter of contract law a seller (uninsured party) may not recover under a buyer's policy of title insurance.   The Trustee urges that what is at issue here is a simple application of agency theories long established under New Jersey law and that First American's contention that title carriers enjoy absolute immunity from tort liability is without merit. *Id.* at 41 (citing *RTC Mortgage Trust v. Fidelity Nat's Title Ins. Co.*, 58 F. Supp. 2d 503 (D.N.J. 1999)).

First American Post-Trial Brief

First American argues that the testimony at trial demonstrates the following facts concerning Woodbury Title and First American:

- First American had an independent contractor relationship with Woodbury Title. (D-6, P-21)

- By October 2006 the Torreses had fallen several months behind on their mortgage and CitiMortgage commenced foreclosure action on the Property.

- The Torreses bargained with SJB to sell their property to Wilson for $150,000 which they received, along with payment of their mortgage debt of $219,185.04.

- The Torreses knew the sale price on their Property to Wilson was $625,000.00.

- The Torreses entered into a Residential Lease-Purchase Agreement by which they agreed to be tenants on the Property and pay rent to SJB, occupied the Property for 18 months without paying taxes or insurance.

- The buyer sold the Property 28 months after the closing for $400,000. (D-7).

- First American did not participate in the subject transaction or direct the participation of Woodbury Title in it, as First American knew nothing about the transaction at any material time.

- First American in general does not control the conduct of title agents or direct how they participate in closings.

- First American does not train or license title agents.

- Woodbury Title cut two checks for sellers' proceeds; one of which SJB cashed; one for the $150,000 negotiated for by the [Debtors], and the second for $251,773.27 which they endorsed to SJB. (P-15).

First American Post-Trial Brief, *supra*, at 6-7.

First American argues that because the Trustee failed to prove the elements of fraud against Woodbury Title, there can be no imposition of liability against First American. First American argues that the Trustee offered no expert testimony to substantiate his position regarding closing procedures, nor his position that Woodbury Title deviated from professional standards. *Id.* at 2. First American further argues that Debtors were not defrauded by Woodbury Title because Woodbury Title made the disbursements according to the terms of the agreement between Debtors and SJB. *Id.* at 3. First American challenges the Trustee's argument that the cutting of two checks with the seller endorsing one to a third party constitutes a diversion of funds inconsistent with the HUD. First American states that comparing the HUD with the checks would have shown the disbursement ledger to be correct, and the transaction in balance. (Exs. P-8, P-15, P-13). First American further argues that "[t]he signature of the [Debtors] on the $251,773.27 check making it payable to SJB indicate their knowledge of and agreement to the transaction." *Id.* at 4. First American contends that even if the Court credited Ms. Torres's

testimony that the check to SJB was forged, the Trustee offered no proof at trial that Woodbury

Title had knowledge of a purportedly forged check.

First American also challenges the Trustee's evidence with respect to damages. First

American argues that the Trustee failed to provide any proof of the value of the property at any

material time. *Id.* at 7. First American contends that the only indication of value was that

Wilson sold the Property for $400,000 in a short sale transaction but what First American

characterizes as an arms-length transaction 28 months after purchasing the Property from the

Torreses. *Id.* at 8. First American urges that this fact either demonstrates lender fraud, or leaves

the Court to speculate how the Property declined $225,000, or 36% in a space of 28 months. *Id.*

First American also argues that the Trustee improperly asserts that the purchase price of

$625,000.00, although the product of a fraudulent transaction, is the measure of damages, and

fails to acknowledge the benefits that the Debtors received in connection with the transaction. *Id.*

First American further argues that the payment to SJB was not fraudulent because SJB and

Wilson assumed the expense of the sale-leaseback transaction having to carry real estate taxes

and insurance. *Id.* at 9.

Next, with respect to conspiracy, First American argues that the Trustee failed to link the

sale of the Property with the alleged larger criminal conspiracy orchestrated by Brian

Mammoccio, as the Principal of New Hope Property. *Id.* at 9. First American argues that none

of the evidence presented implicates Woodbury Title, and does not include the Debtors' Property

in any way. *Id.* Rather, First American contends that all of the evidence suggests loan and tax

fraud, as opposed to fraud upon the sellers. *Id.* First American reasons that if the value of the

Property was only $400,000, and the sale price was $625,000 to Wilson, then the fraud was

actually on the lender, and the Debtors actually received a benefit close to their actual equity in

the Property, $150,000.00 plus $219,185.04 representing the mortgage payoff for a total of $369,185.04. *Id.* at 10. First American argues that the Trustee's failure to eliminate the possibility of lender fraud based on the evidence presented by failing to prove value of the Property equates to a failure to carry his burden of proof. *Id.* at 11.

First American argues that the Trustee failed to prove misconduct or legal or equitable fraud by Woodbury Title, which fraud the Trustee must show by clear and convincing evidence. *Id.* at 13 (citing *Stochastic Decisions Inc. v. DiDomenico*, 236 N.J. Super. 388 (App. Div. 1990), *cert. den.*, 121 N.J. 607 (1990)). Further, First American argues that Trustee's claim against Woodbury Title for aiding and abetting a fraud also fails, as essential to the claim is proof that Woodbury Title aided and abetted by committing a tort. *Id.* at 14 (citing *State, Dept. of Treasury Div. of Inv. Ex rel McCormac*, 387 N.J. Super. at 482). First American further urges that without clear and convincing proof of fraud by Woodbury Title the civil conspiracy claim also fails. *Id.* at 15 (citing *Morgan v. Union City Bd. Of Chosen Freeholders*, 268 N.J. Super. 337, 364 (App. Div. 1993)).

Next, First American repeats its position that "there exists no legal basis for a seller to pursue a tort claim against a title insurance underwriter based upon the conduct of a title agent." *Id.* at 19. Thus, First American urges this Court to hold as a matter of law that an insurance underwriter cannot be held vicariously liable for the acts of a title company. *Id.* First American further argues that even if the Court finds that such a cause of action is permitted under certain circumstances, here the Trustee has failed to specify any conduct on the part of First American that supports a finding that it is vicariously liable for the conduct of Woodbury Title. *Id.* at 15. First American contends that the Agency Agreement between it and Woodbury Title proves that Woodbury Title was a non-employee agent of First American for a limited purpose, and

therefore, First American cannot be held liable for Woodbury Title's alleged wrongdoing. *Id.* at

16-17 (citing *JMB Enterprises Ins. Co.*, 228 N.J. Super. at 617-18).  First American urges that

the independent contractor agent's power to bind involves only contractual obligations and

should not be held to involve a title underwriter in tortious conduct "by osmosis," as in a

situation involving a principal and an independent contractor agent, the principal's liability is

limited to the contract and absent special circumstances, the negligence of the non-employee

agent, i.e. independent contractor is not imputed to the principal. *Id.* at 18 (citing *Johnson v.*

*MacMillan*, 233 N.J. Super. at 62).  First American argues that its position that Woodbury Title's

agency is contractual and limited, and its liability is to its insureds exclusively is well

established. *Id.* at 20 (citing *Karpontinis*, 2013 N.J. Super. Unpub. LEXIS 641; *Flanagan*, 2014

N.J. Super. Unpub. Lexis 1127; *Stewart Title v. Greenlands Realty*, 58 F. Supp. 2d 370, 386

(D.N.J. 1999) ("[A]n independent tort action is not cognizable where there is no duty owed to the

plaintiff other than the duty arising out of the contract itself.")).  Thus, First American asserts

that the Trustee cannot maintain a cause of action against it based on allegations of vicarious

liability for the tortious conduct of an agent as the seller of real estate has no such claim.  First

American urges that the case law relied upon by the Trustee, including *In re Curriden* and

*Lawyers Title* are unavailing.

 First American contends that Trustee's allegations that Debtors relied upon Woodbury

Title to close a real estate transaction do not extend to the agency relationship encompassed by

the Agency Agreement. *Id.* at 18-19.  First American cites to sections of the Agency Agreement

that it asserts limit the scope of the title insurer's duties and responsibilities in carrying out its

function. *Id.* at 34-35 (citing Agency Agreement, ¶¶ 1, and 3.D, 3.F).[10]  First American also cites

---

[10] The "Agency Agreement" provides, in part:
    APPOINTMENT OF AGENT

to the indemnification clause in the Agency Agreement, which provides in pertinent part that

"[i]f Agent is a party to an action for which Insurer is liable for payment, Insurer agrees to

indemnify Agent for any reasonable expenses it may incur, including counsel fees." *Id.* at 35.

First American contends that these clauses ¶¶ 13.B.4[11] and 16 read together establish that "the

---

1.  Insurer appoints Agent as its representative, or agent, to originate and solicit applications for title insurance, to examine and issue commitments to insure, and to issue and countersign Policies of Title Insurance (sometimes hereinafter collectively and/or singularly referred to as the "Business of Title Insurance") in the State of New Jersey.

NON-EXCLUSIVE AGENCY
The appointment of Agent is on a non-exclusive basis. It is subject to the rights of other agents or representatives of Insurer now or hereafter appointed by Insurer to conduct the Business of Title Insurance.

•    •    •

PROHIBITED ACTS
3. Agent shall not, without prior written approval of Insurer:
...
POLICY COVERAGE
D.   Vary or change the printed portion of any form of Commitment to Insure, Binder, or Policy of Title Insurance furnished to Agent by Insurer, whether by physical alteration of the form or by separate writing, nor commit Insurer to any particular interpretation of the terms or provisions of any Commitment to Insure, Binder, or Policy of Title Insurance.
...
ACCEPT FUNDS FOR INSURER
F.   Receive or receipt for any funds, including escrow, or closing funds, in the name of the Insurer, but shall receive and receipt for same for its own account.

Ex. P-21.

[11] The "Agency Agreement" provides, in part:

INDEMNIFICATION

13. Agent shall be liable to Insurer for all loss, cost or damage, including attorney's fees and other costs, which Insurer may sustain, or become liable for, on account of:

BREACH OF CONTRACT

A.   Failure of Agent to comply with the terms of this Agreement or with rules, regulations, and instructions given to Agent by Insurer.

FRAUD, NEGLIGENCE, ETC.

contractual indemnity of a title agent is limited to causing a policy loss." *Id.* at 36. First

American asserts that the Trustee's claims fall outside the policy, and that there was no evidence

presented at trial that Debtors relied upon First American when they entered into the real estate

transaction.

First American argues that the Trustee incorrectly interprets *Lawyers Title* to allow a

cause of action based upon an agency theory.   First American contends that the correct

understanding of *Lawyers Title* is set forth in an opinion by the Court of Appeals of Indiana. *Id.*

at 38 (citing *Fidelity National Title Insurance. Co. v. Mussman*, 930 N.E.2d 1160 (Ind. Ct. App.

2010)).  First American argues that the facts in *Mussman* are analogous to present facts.  In that

case, the plaintiffs contracted to sell real estate to Floramo Partners, Ltd. ("Floramo"). *Id.* at

1163.  The plaintiffs' $1.6 million proceeds check failed to clear due to theft of escrowed funds

by individuals affiliated with the closing title agent, Intercounty Title Company ("ITC"). *Id.* The

plaintiffs filed suit against the underwriter ("Fidelity National"), *inter alia*, on an agency theory.

---

B.  Any dishonest, fraudulent, malicious, criminal or grossly negligent act, whether by Agent or by Agent's
employees or parties hired by Agent, in connection with either:

(1)  The issuance of an abstract title, binder, Commitment to Insure, or Policy of Title Insurance or other
evidence of title of the Insurer; or

(2)  A closing by the Agent, its employees, or its independent sub-contractors involving the issuance of a Policy
of the Insurer.

(3)  Agent may, at its election, pay any and all claims brought against it under terms of this section, and shall
then be subrogated to the rights of Insurer with respect to same.

(4)  Escrow loss limited to losses occasioned by Agent's failure to disburse properly or close in
accordance with escrow instructions, or where such escrow funds are misappropriated by Agent,
its officers or employees.

Agent's liability to Insurer for ordinary negligence shall not exceed the amount of liability insurance required to
be maintained under the provisions of paragraph 2 G of this Agreement.
...
INSURER'S LIABILITY

16.  Insurer shall be liable for all other losses, damage, expense and cost arising out of claims covered by, and
based upon, any title insurance forms issued under the terms of this Agreement, excepting only those
losses, damage, expense and cost caused by actions, or omissions, for which Agent is responsible in this
Agreement.  If Agent is a party to an action for which Insurer is liable for payment, Insurer agrees to
indemnify Agent for any reasonable expenses it may incur, including counsel fees.

Ex. P-21.

The plaintiffs argued that based upon the agency agreement and the conduct of the parties that the title agent acted on behalf of Fidelity National in conducting escrow and closing services. *Id.* at 1165. The agency agreement at issue contained an indemnification clause indemnifying Fidelity National for "[loss[es] arising from escrow or Non-Title Assurance Operations." *Id.* at 1166. The trial court ruled in favor of the plaintiffs on summary judgment. On appeal, the court reversed in favor of Fidelity National. Rejecting plaintiffs' apparent agency theory with respect to *apparent* authority, the court determined that there "was no assurance, conduct, or other communication by Fidelity that the [plaintiffs] could have relied upon to believe there was an agency relationship between Fidelity National and ITC." *Id.* at 1165. The court then turned to plaintiffs' argument that an agency relationship existed because ITC had *actual* authority to close the transaction on behalf of Fidelity National. The court also rejected this argument, finding that the terms of the agency agreement "expressly limited the scope of ITC's agency," and thus also limits "Fidelity's responsibility." *Id.* at 1166. In reaching this result, the court expressly rejected the plaintiffs' reliance on *Lawyers Title*. The court stated as follows:

> As in this case, in *Lawyers Title* the agency agreement between Lawyers Title and Central Title did "not specifically require that Central Title perform real estate sale closings." *Id.* at 446. The court observed, however, that the terms of the agreement anticipated that Central Title "may conduct closings due to the circumstances of a particular transaction or as a result of local custom, such as the practice in southern New Jersey of having a title agent handle the closing." *Id.* And the court simply concluded that "[t]he Agreement thus acknowledges that Central Title acts on Lawyers Title's behalf and conducts Lawyers Title's business in performing a closing." *Id.* But this summary conclusion was not an adjudication of a contested issue and is not precedent. In *Lawyers Title*, the contested issue decided by the court was not whether Central Title was Lawyers Title's agent for closing purposes but whether Central Title was liable for the acts of its subagents.
>
> Here, in contrast, while the parties contemplated that ITC would provide closing and escrow services, the text of the Agreement expressly limits ITC's agency to the issuance of title insurance commitments and policies and, further, provides that ITC was not to receive any funds "including escrow, settlement or closing

funds" in Fidelity's name. In *Lawyers Title*, there was no such contractual limitation on Central Title's agency. Questions of agency are always fact-sensitive, and we find nothing in the circumstances of this particular transaction or any evidence of local practice that would obviate the plain meaning of the Agreement between Fidelity and ITC.

*Id.* at 1166 (internal citation omitted).

First American urges this Court to adopt a similar analysis with respect to the agency agreement in this case. First American Post-Trial Brief, *supra*, at 39. First American also attempts to distinguish *Stout Street Funding v. Johnson*, 2014 WL 5591043 (E.D. Pa. Nov. 4, 2014), cited by Trustee. First American argues that this case is distinguishable because it addresses liability to a prospective insured lender that had received a title commitment, but says nothing about tort liability to third parties. *Id.* at 44.

First American also offers public policy arguments against imposing vicarious liability. It argues that the prohibition against tort liability in favor of contractual liability found in *Walker Rogge*, 116 N.J. 517 should be followed here and that N.J.S.A. 17:46B–12 limits an underwriter's liability because an underwriter is restricted to selling only title insurance. *Id.* at 48. First American states that the purpose of this restriction is to preserve the solvency of title insurers who charge a single premium for insurance against title defects as of the date of the policy, but without a time limit on a go forward bases. *Id.* at 49. Therefore, First American argues that "expanding title underwriter liability to cover the torts of title agents presents a realm of liability entirely outside that of the statutory limits on title insurance." *Id.* First American also argues that such an imposition of liability would disrupt the statutory scheme for regulation premiums. *Id.* (citing N.J.S.A. 17:46B–1 to –62). First American states that "any attempt to impose liability on a title insurance underwriter outside the parameters of title insurance necessary calls for an adjustment in the premium charged for title insurance." *Id.* at 50. First

American contends that it is the purview of New Jersey Legislature, not the courts, to enact the substantive laws required to permit such liability. *Id.*

Trustee's Post-Trial Motion

On October 12, 2015, Trustee filed an application for shorten time and motion to withdraw fact number 13 of the joint stipulation and to permit the Trustee to file a supplemental post-trial brief addressing the N.J. consumer fraud count of the Complaint. Trustee's Post-Trial Motion, *In re Torres*, Case No. 09-34115, ECF Nos. 142-143. First American opposed the applications. This Court held a hearing on November 17, 2015, and entered an Order on November 30, 2015 denying Trustee's Motion. ECF No. 157.

Trustee's Supplemental Post-Trial Brief

On December 2, 2015, the Trustee filed a supplemental post-trial brief. Trustee's Supplemental Post-Trial Brief, *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 158. The Trustee argues that circumstantial evidence can be used as a basis in civil cases for the Court's findings here and an adverse inference drawn based on the defaulting defendants' choice not to appear and testify, *Id.* at 1 (citing *Ameralda Hess Corp. v. Quinn*, 143 N.J. Super 237, 249 (Law Div. 1976)), additionally, because they are in default, these parties are deemed to have admitted the factual allegations of the complaint. *Id.* at 3 (citing *Ford v. Consigned Debts & Collections, Inc.*, 2010 WL 5392643, at *2 (D.N.J. 2010)). The Trustee here asserts that by virtue of their default, the Defaulting Parties are deemed to have admitted the facts of the Plaintiff's Complaint including the following:

> (i)    At all relevant times, SJB solicited owners of distressed real property offering alleged foreclosure rescue solutions. By and through its president Wilson and other employees, including Christopher Roesly, SJB orchestrated a sale and leaseback transaction involving the Debtors' Property. At the June 2007 closing of the sale to Wilson, SJB received proceeds in the amount of $251,773.27. See Plaintiff's Complaint, at ¶ 9.

(ii)    Despite the indication on the Settlement Statement that the Debtors were to receive proceeds in the amount of $401,698.27, the Debtors received only the sum of $150,000. The balance of the Debtors' proceeds in the amount of $251,773.27 were disbursed to SJB. See Plaintiff's Complaint, at ¶ 35.

(iii)    In accordance with the sale and leaseback transaction, in which all of the Defendants willingly participated, the Debtors were fraudulently deprived of the title to the Property and stripped of a substantial portion of the equity therein. Other than the $150,000 disbursement at the June 2007 closing, the Debtors never received any additional disbursement of the sale proceeds due to them according to the signed Settlement Statement. See Plaintiff's Complaint, at ¶ 44.

Id. at 3-4 (citing Plaintiff's Complaint, supra, ¶¶ 9, 35, 44).

Trustee argues that the evidence at trial proves that the entire transaction was a "fraud intended to steal the Debtors' equity [in the Property]." Id. at 5. In addition, the Trustee asserts that Lewis' testimony establishes that she knew she was creating an unauthorized payment in preparing the check to SJB (Ex. P-15) since it was not included on the HUD and contrary to the lender's instructions which barred deviation from the HUD. (Tr. 8/24/15 p. 26). The Trustee argues that Wilson testified that the Debtors were never informed of the "fee" that SJB would receive for its participation in the action, that the sale of the Property would generate net sale proceeds in the amount of some $400,000 that belonged to them, that $251,000 of these proceeds were going to be diverted to SJB, a stranger to the transaction, or that Woodbury Title would disburse the sum of $251,773.27 in a manner inconsistent with the HUD and against the lender's closing instructions and without the knowledge or consent of the Debtors. Id. at 5. The Trustee also cites to Ms. Torres's testimony that she never knew about, saw or endorsed the check given to SJB at closing. The Trustee cites to Lewis's testimony that the HUD indicated that the Debtors were supposed to receive $401,698.27 as "Cash to Seller." Id. at 5-6 (citing HUD, Ex. P-8, Line 603).

Trustee argues that all of defaulting parties participated in this scheme, including Woodbury Title. Trustee argues that based upon testimony from various witnesses, there was no legal basis for any distribution to Wilson or SJB. Trustee notes that the HUD was signed by Abrams as the "settlement agent," and was subject to the statement that "the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the transaction. I have caused or will cause the funds to be disbursed in accordance with the statement." (Ex. P-8). The Trustee also points out that Abrams signed the HUD subject to the express warning that "it is a crime to knowingly make false statements to the United States on this or any similar form." *Id.* Trustee argues that these statements by Abrams were knowingly false and that Debtors relied upon them in consummating the transaction. *Id.* at 7. Trustee further argues that Lewis acted knowingly and fraudulently when she knowingly released the unauthorized payment to SJB in violation of the HUD. *Id.* at 7-8.

The Trustee highlights an indictment purportedly describing certain of the defendants' fraudulent business practices. *Id.* at 6 (citing *U.S. v. Brian Mammoccio* Indictment, Ex. P-45). Trustee contends that the Court should take judicial notice of Mammoccio's guilty plea to Count 2 of the indictment and the facts contained therein to support a finding that Mammoccio, Velahos, Woodbury Title, Wilson and SJB, the parties, were involved in a collective fraudulent scheme. *Id.* at 7-8 (citing Fed. Rule Evid. 20).   The Trustee also urges that Wilson's testimony and Exhibit 24 demonstrate that SJB closed some 30 identical sale and lease back transactions with Woodbury Title Agency both before and after Torreses' closing. *Id.* at 9 (citing Fed. Rule Evid. 404(b); *U.S. v. Cardenas,* 32 F.3d 563 (4th Cir. 1994)(dealing with the admissibility of similar act evidence under Fed. Rule Evid. 404(b)). Trustee concludes that judgments should be

entered against the defaulting defendants Velahos, Abrams, Lewis, Woodbury Title, and SJB and

imposing vicarious liability against First American. *Id.*

First American's Reply to Plaintiff's Supplemental Post-Trial Brief

On December 21, 2015, First American filed a reply to Trustee's supplemental post-trial

brief. *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 161.

First American argues that the Trustee's theory of liability against Woodbury Title fails

because it is based on a false assumption that the Torreses did not have knowledge of the

transaction.   First American contends that Ms. Torres's testimony shows that the Debtors

expected and received $150,000, along with satisfaction of their mortgage debt, and the right to

remain on the property for a year.   *Id.* at 2. (citing Stipulated Facts ## 8, 12 & 13; P-15: 1T90-9;

1T60-62, 1T41-46, 1T68-69; 1T77 & 1T82-83).   Thus, First American contends that Woodbury

Title did nothing except close a transaction to which the Torreses had agreed.   *Id.*   First

American further argues that the Trustee failed to present any evidence that Woodbury Title,

including its defendant employees and owner knew or had reason to know of the alleged forged

check, presuming that a forgery had occurred. *Id.* at 2-3.   First American further argues that the

Trustee offered no expert evidence to prove his position that Woodbury Title deviated from

professional standards in closing this transaction. *Id.* at 3.   Instead, First American posits a

different theory – that the Torreses knew that the purchase price of the property had been inflated

by SJB, so that the parties could participate in loan fraud against the lender. *Id.* at 4.

Second, First American argues that the Trustee by choosing not to present an appraisal to

substantiate his damage claim has failed to demonstrate that the Torreses lost equity in the

property. *Id.* at 3. First American states that rather than the Property being worth the purchase

price of $625,000, "[i]f the Property was worth $400,000 which is what Wilson subsequently

sold it for at the time of the transaction, then the Torreses received their 'equity' ($150,000 +

$219,185.04 (mortgage payoff) = $369,185.04)." *Id.* at 5. Further, First American notes that

fraud is not presumed but must be proven by clear and convincing evidence, and that the

Trustee's reliance on circumstantial evidence and inferences do not meet this standard. *Id.* at 5

(citing *DiDomenico,* 236 N.J. Super at 395).

First American argues that this Court should not consider a document attached to

Trustee's supplemental post-trial brief, Exhibit P-46. *Id.* That document is a plea agreement sent

by Matthew T. Smith, Assistant U.S. Attorney for the District of New Jersey on May 8, 2014, to

Mr. Mammoccio's attorney, Jose Ongay, Esq.  First American argues that this Court already

denied the Trustee' post-trial motion to place Exhibit P-46 into the record, and that Trustee

previous voluntarily withdrew this document. (Tr. 8/24/25 at 57).  First American further argues

that under Fed. Rule Evid. 201 and *Government of Virgin Islands v. Gereau*, 523 F.2d 140, 147

(3rd Cir. 2001), the Court may take judicial notice only of "a fact that is not subject to reasonable

dispute". *Id.*  Thus, First American takes the position that even if this Court were to take judicial

notice of the document, all the document can show is that on May 15, 2014, Mammoccio pled

guilty to one count of wire fraud. *Id.* at 6. First American argues that this fact has no relevance or

probative value in this case. *Id.*

First American returns to its argument that it cannot be held vicariously liable for the acts

of Woodbury Title. *Id.* at 8-9. First American contends that the Trustee is attempting to obtain a

judgment against Woodbury Title for fraud based on the fact that it defaulted and hold First

American vicariously liable without proof.  First American contends that the *Curriden* case cited

by the Trustee actually supports First American's position. *Id.* at 9. First American notes that in

*Curriden*, the court excluded the title agent and the employee who closed the transaction from

66

the conspiracy to defraud the sellers, finding that despite some suspect closing conduct, "no such fraud or deceptive practices were established at trial against these defendants." *Id.* (citing *In re Curriden*, 2007 WL 2669431, at *20). First American also calls the Court's attention to a supplemental decision issued in *Curriden* in 2008 concerning an aiding and abetting cause of action against the closing agent and title agency. *Id.* at 11 (citing *In re Curriden*, Case No. 05-38352-JHW (Bankr. D.N.J. June 25, 2008)). There the court noted that despite some suspect closing conduct, there was no evidence that employee or the title agency shared with the guilty parties the intent to defraud the seller. *Id* at 13 (citing *Curriden, supra*, at *40-41). Therefore, the court dismissed the claim for aiding and abetting fraud against these entities. First American urges that there is no proof that Woodbury Title or any employee of it made any representations that were known to be false upon which the Debtors relied.

First American argues that this Court should similarly find that no facts have been placed in the record to support a finding of liability against Woodbury Title; and consequently, First American cannot be held vicariously liable as matter of law.

First American's January 17, 2017 Letter

On January 17, 2017, First American filed a Letter in support of its arguments with respect to vicarious liability. *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 163.

First American noted that it previously relied upon the Superior Court's trial level opinion in *Thurber v. Thurber*, and that recently, the Appellate Division issued an opinion affirming the trial court in favor of First American. *Id.* at 2 (citing *Thurber v. Thurber*, No. A-4578-14T4, 2017 WL 164480 (App. Div. Jan. 17, 2017)). First American contends that *Thurber* is factually and legally similar to the present case. *Id.* As in this case, *Thurber*'s facts concerned a sale-leaseback scheme involving Woodbury Title. *Id.* First American notes that in that case, it

obtained summary judgment at the trial level, but summary judgment was not granted to Woodbury Title. *Id.* First American notes that the Appellate Division affirmed the trial court's summary judgment order, stating that "there is no authority presented allowing a seller or non-party to the real estate transaction to recover against a buyer's title insurer, using theories of agency or apparent authority." *Id.* at 2 (quoting *Thurber*, 2017 WL 164480, at \*7). First American further notes that the court rejected the plaintiff's reliance on *Sears*, 134 N.J. 326 stating: "We decline to expansively read <u>Sears</u> to create such liability. The claims here are intentional torts, making this authority relying on the terms of the contract inapposite. Accordingly, plaintiff has no claim against First American." *Id.* First American argues that this holding applies directly against the Trustee's position in this Case, and is in accord with the *Karpontinis* decision previously provided to the Court.

<u>Trustee's February 10, 2017 Letter</u>

On February 10, 2017, Trustee filed a Letter in response to First American's Letter and the *Thurber* decision. *Stanziale v. Velahos*, Adv. Pro. No. 11-02336, ECF No. 164.

First, Trustee notes that *Thurber* is an unpublished decision and therefore does not constitute precedent or binding authority. *Id.* at 1-2 (citing N.J. Ct. R. 1:36-3). Second, Trustee contends that the plaintiff in *Thurber* was not similarly situated with the Debtors in this case because the plaintiff had been ousted from title years before closing via a deed allegedly forged by her ex-husband, and was not a party to the closing conducted by First American. *Id.* at 2. Trustee further notes that at page 20 of the Opinion the *Thurber* court notes that "Plaintiff's proofs did not show Woodbury and Velahos's conduct occurred as agents for First American." *Id.* (citing *Thurber*, 2017 WL 164480, at \*7). Thus, the Trustee contends that *Thurber* does not

expressly address the vicarious liability of First American, nor is it factually on all fours with the present matter. Accordingly, Trustee urges this Court not to follow *Thurber* here.

First American's Letter

On May 8, 2017, and May 9, 2017, First American advised this Court that on May 5, 2017, the New Jersey Supreme Court denied a petition for certiorari in the *Thurber* case. *See Thurber v. Thurber*, No. A-4578-14T4, 2017 WL 164480, at \*7 (App. Div. Jan. 17, 2017), *cert. denied*, No. 078935, 2017 WL 2098911 (N.J. May 5, 2017).

# LEGAL STANDARD AND ANALYSIS

## I.    Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a) of the Bankruptcy Code.[12]

## II.    Trustee's Causes of Action Against Defaulting Parties

Here, the Trustee is seeking judgment pursuant to common law legal fraud, equitable fraud, civil conspiracy, and aiding and abetting fraud and civil conspiracy against the Defaulting Parties, Velahos, Abrams, Lewis, Woodbury Title and SJB.

Common law fraud has five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting

---

[12] Pursuant to the United States District Court for the District of New Jersey's Standing Order of Reference, dated July 23, 1984, as amended September 18, 2012, "[a]ny or all cases under Title 11 of the United States Code and any or all proceedings arising under Title 11 of the United States Code, or arising in or related to a cause under Title 11 of the United States Code shall be referred to the bankruptcy judges for the district."

damages." *In re O'Brien*, 423 B.R. 477, 487 (Bankr. D.N.J. 2010) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 A.2d 350, 367 (1997)).

"In general, equitable fraud requires proof of (1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party." *Toll Brothers*, 194 N.J. at 254 (quoting *First Am. Title Ins. Co. v. Lawson*, 177 N.J. 125, 136–37, 827 A.2d 230 (2003)).

Under New Jersey law a civil conspiracy is:

> "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." Most importantly, the "gist of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'"

*In re Curriden*, 2007 WL 2669431, at *8 (quoting *Banco Popular North America v. Gandi*, 184 N.J. 161, 177–78, 876 A.2d 253, 263 (2005) (citations omitted)).

A claim for aiding and abetting fraud and civil conspiracy requires a plaintiff to establish "the existence of an independent wrong, knowledge of that wrong and substantial assistance of the part of the aider or abettor to effectuate that wrong." *State, Dept. of Treasury Div. of Inv. ex rel. McCormac*, 387 N.J. Super. at 481-82 (citing *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978); *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 162-63 (3d Cir. 1973); *Cammer v. Bloom*, 711 F.Supp. 1264, 1296 (D.N.J. 1989)).

The party asserting a fraud bears the burden of proving that fraud by clear and convincing evidence. *Stochastic Decisions v. DiDomenico*, 236 N.J. Super. at 395; *see also In re Price*, 361 B.R. 68, 82 (Bankr. D.N.J. 2007) (citing *Baldasarre v. Butler*, 254 N.J. Super. 502, 521, 604 A.2d 112 (App. Div. 1992), *rev'd on other grounds*, 132 N.J. 278, 625 A.2d 458 (1993)).

The Trustee also seeks punitive damages against the Defaulting Parties pursuant to

N.J.S.A. 2A:15–5.9 to –5.17.  The New Jersey Supreme Court has stated that "[t]o warrant a

punitive award, the defendant's conduct must have been wantonly reckless or malicious.  There

must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by

a wanton and willful disregard of the rights of another." *Nappe v. Anschelewitz, Barr, Ansell &*

*Bonello*, 97 N.J. 37, 49, 477 A.2d 1224, 1230 (1984).

## III.   Default and Default Judgment

Federal Rule of Civil Procedure 55, made applicable in bankruptcy by Federal Rule of

Bankruptcy Procedure 7055 states, "when a party against whom a judgment for affirmative relief

is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or

otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a).

Furthermore, Rule 55(b)(1) provides that

> [i]f the plaintiff's claim is for a sum certain or a sum that can be made certain by
> computation, the clerk--on the plaintiff's request, with an affidavit showing the
> amount due--must enter judgment for that amount and costs against a defendant
> who has been defaulted for not appearing and who is neither a minor nor an
> incompetent person.

Fed. R. Civ. P. 55(b)(1).

In all other cases, Rule 55(b)(2) provides for entry of default judgment by the Court,

which requires that the party seeking a judgment "apply to the court for a default judgment ... If

the party against whom a default judgment is sought has appeared personally or by a

representative, that party or its representative must be served with written notice of the

application at least 7 days before the hearing.  The court may conduct hearings or make referrals-

-preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it

needs to: ... (B) determine the amount of damages ..." Fed. R. Civ. P. 55(b)(2).

The Third Circuit has "adopted a policy disfavoring default judgments and encouraging decision on the merits." *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 982 (3d Cir. 1988); *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984) (Doubtful cases must be resolved in favor of the party moving to set aside a default judgment so that cases may be decided on the merits).

Obtaining a default judgment involves a two-step process: first, default must actually be entered against the non-appearing party, and second, after the entry of default, the movant must request the entry of default judgment. *In re Park*, 272 B.R. 323, 328 (Bankr. D.N.J. 2001). Therefore, an entry of default alone does not automatically entitle the non-defaulting party to the entry of a default judgment. *Id.* (citing *In re Beltran*, 182 B.R. 820, 823 (9th Cir. BAP 1995); *In re Villegas*, 132 B.R. 742, 746 (9th Cir. BAP 1991); *In re Ripple*, 242 B.R. 60, 63 (Bankr. M.D. Fla. 1999)). "Before a plaintiff can obtain a default judgment pursuant to Rule 55(b), a plaintiff must secure an entry of default per Rule 55(a)." *Allaham v. Naddaf*, 635 F. App'x 32, 36 (3d Cir. 2015); *see also Husain v. Casino Control Comm'n*, 265 F. App'x 130, 133 (3d Cir. 2008) (where default judgment was denied because the clerk did not first enter default).

To be entitled to a default judgment, the plaintiff must demonstrate a *prima facie* case by competent evidence. *In re Park*, 272 B.R. at 329. As a result, the plaintiff's allegations must be sufficient to state a claim for relief, but "if the plaintiff's claim lacks merit, and is unsupported by the law, the court may deny a motion for default judgment despite the technical default." *Id.* In *Park*, the court stated that "[a] trial court has wide discretion in determining whether to enter a default judgment, and its decision will not be overturned unless there is an abuse of discretion." *Id.* However, "while entry of a default judgment is largely within a district court's discretion, three factors control this determination: '(1) prejudice to the plaintiff if default is denied, (2)

whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct.' " *Allaham*, 635 Fed. App'x at 36 (quoting *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000)).

After default is entered, "the factual allegations of the complaint, *except those relating to the amount of damages*, will be taken as true" and are deemed admitted by the defaulting party. *J & J Sports Prods. Inc. v. Jamie A. Craley*, 2014 WL 1203314, at *1 (M.D. Pa. Mar. 24, 2014) (quoting *DirectTV, Inc. v. Pepe*, 431 F.3d 162, 165 n.6 (3d Cir. 2005)) (emphasis added). "Accordingly, a defaulting party may not attack the factual allegations in a complaint; however, that does not mean that the party admits to the legal conclusions made in the complaint." *In re Park*, 272 B.R. at 329. "Even after default, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *In re Wildlife Ctr., Inc.*, 102 B.R. 321, 325 (Bankr. E.D.N.Y. 1989).

In the present matter, Defendants Velahos, Abrams, Lewis, and Woodbury Title filed an Answer to the Complaint on November 4, 2011. Answer to Complaint, *supra*, ECF No. 5. SJB did not file an answer. On August 4, 2015, the Court received correspondence from Velahos advising that he would not be appearing at trial, he did not take issue with default being entered against him, and that he was no longer practicing law. Because none of these parties filed any responses after the initial answer to the complaint, and these parties did not appear at trial, the Answer is stricken and default is entered against Velahos, Abrams, Lewis, Woodbury Title and SJB. *See Jackson Hewitt Inc. v. Larson & Savage, Inc.*, No. CIV. 13-403 WJM, 2014 WL 4384535, at *2 (D.N.J. Sept. 2, 2014) ("The Federal Rules of Civil Procedure authorize courts to impose sanctions for failure to respond to court orders and for failure to prosecute a case. *See*

Fed. R. Civ. P. 37(b)(2). The striking of a pleading and entry of default may be an appropriate

penalty in either instance.")

In addition to seeking entry of default, Trustee argues that this Court should enter a final

default judgment against all of the Defaulting Parties.   When considering the entry of final

judgment, this court must accept all the factual allegations contained in the complaint as true. *In*

*re Park*, 272 B.R. at 328-29.

The following facts can be gleaned from the Trustee's Complaint:[13] (1) defendants

Wilson (now dismissed from the case) and SJB solicited the Debtors and persuaded them to enter

---

[13] The Complaint alleges in pertinent part:

16.      In or about September 1990, the Debtors purchased the Property, subject to a mortgage of approximately $229,000 in favor of Lancaster Financial Ltd., Inc.  The mortgage was assigned on three occasions and in the fall of 2006 was held by Citimortgage, Inc.

17.      By October 2006, the Debtors had fallen several months behind on their mortgage.  Consequently, Citimortgage, Inc. commenced a foreclosure action in the Superior Court of New Jersey.  At that time, the Property was subject to a mortgage lien in the approximate amount of $220,000.

18.      At or about the same time, the Debtors began to receive solicitations in the mail and by telephone from companies including SJB, that claimed they could help the Debtors save their home from foreclosure.  By the spring of 2007, representatives from SJB including Wilson and Roesly, were calling the Debtors almost on a daily basis to propose a way in which SJB could aid the Debtors in avoiding the loss of their home through foreclosure.

19.      In a continuing effort to hook the Debtors in their scheme, and in or about April 2007, Wilson and Roesly went to the Debtor's home to pitch them a sale and leaseback transaction.  At or about that time, the SJB representatives urged the Debtors to move quickly so that a transaction could be completed before a Sheriff's Sale was scheduled in the foreclosure case.

20.      SJB presented the Debtors with a textbook sale and leaseback transaction, pursuant to which Wilson would purchase the Property, and the Debtors would lease it back for a term of one year with an option to purchase at a fixed amount.  SJB explained to the Debtors that it would obtain an appraisal of the Property, and then would negotiate the purchase price and other relevant figures with the Debtors.

21.      While on April 10, 2007, a contract for sale of the Property from the Debtors to Wilson was prepared by SJB, it was not signed by the Debtors until May 16, 2007 (the "Contract").  Pursuant to the Contract, the Debtors were to sell the Property to Wilson for the sum of $625,000, a price that was unilaterally determined by Wilson and/or SJB.  The Contract did not require Wilson to tender any deposit or earnest any money to the Debtors. Based upon the Contract, Wilson intended to fund the purchase price with a mortgage loan in the approximate amount of $531,250, and a cash payment of $93,750 due at closing.  The Contract called for the closing to occur at the offices of Woodbury Title on May 15, 2007, at 6:00 p.m[.] in the evening.

22.      After the contract was prepared, and on or about April 25, 2007, SJB obtained an appraisal of the Property. According to the Uniform Residential Appraisal Report obtained by SJB, the Property was valued at $625,000.

23.      On or about May 16, 2007, the Debtors entered into a Residential Lease-Purchase Agreement (the "Leaseback Agreement") with SJB, rather than with Wilson who was the proposed purchaser of the Property. Wilson and/or SJB prepared the Leaseback Agreement, and all of the terms contained therein were unilaterally dictated by Wilson and/or SJB.  In relevant part, the Leaseback Agreement provides that the Debtors may lease the Property from SJB for a period of one year commencing on June 1, 2007, and with one 6 month extension thereafter if requested by the Debtors.  Furthermore, the Debtors were granted an exclusive option to purchase the Property

into a sale-leaseback transaction in an attempt to save their home from foreclosure (Compl., ¶¶

17-26); (2) defendants Wilson (now dismissed from this action) and SJB made affirmative

misrepresentations and failed to disclose material facts to the Debtors (*Id.*, ¶¶ 21-26, 35, 89); (3)

---

during the lease term for the amount of $531,250, which was the proposed amount of the mortgage Wilson would obtain to finance the purchase of the Property.

24.     An unsigned version of the Leaseback Agreement dated April 18, 2007 obtained by the Plaintiff contains similar provisions as the signed version, but the option price granted to the Debtors in the unsigned version was $480,000, rather than $531,250.

25.     The Leaseback Agreement was revised by an Addendum to Contract that was also dated May 15, 2007 (the "Addendum"). Wilson and/or SJB prepared the Addendum, and all of the terms contained therein were unilaterally dictated by Wilson and/or SJB. In relevant part, the Addendum provides that at closing $65,000 of the sale proceeds due to the Debtors would be placed into an SJB escrow account to prepay the Debtors' rental obligations under the Leaseback Agreement. The Addendum further provides that the Debtor would receive the sum of $150,000 for the sale proceeds at closing.

26.     Other than the $65,000 funds that were to be escrowed as set forth in the preceding paragraph, neither the Leaseback Agreement nor Addendum provided for the disbursement of any sale proceeds to Wilson or SJB.

...

31.     The Debtors were not provided with any of the closing documents prior to their appearance at the closing.

32.     Pursuant to the signed HUD-1 Settlement Statement (the "Settlement Statement"), Wilson funded the purchase with a mortgage loan from Credit Suisse Financial Corporation ("Credit Suisse") in the amount of $525,526.29, plus a cash contribution of $112,208.37. The Settlement Statement further demonstrates that the Debtors were to receive proceeds in the amount of $401,698.27. Other disbursements reflected on the Settlement Statement include closing and notary fees of $440, and a fee of $3,014 for title insurance, all payable to Woodbury Title. Also, Velahos received an attorney fee of $300 from the buyer, and Woodbury Title was paid $200 by the Debtors for closing services.

...

34.     The Debtors were not represented by an attorney at the closing, and no one at the closing advised the Debtors as to the nature of the documents that were presented to them for signing.

35.     Despite the indication on the Settlement Statement that the Debtors were to receive proceeds in the amount of $401,698.27, the Debtors received only the sum of $150,000. The balance of the Debtors' proceeds in the amount of $251,773.27 were disbursed to SJB (the "Disbursement").

...

44.     In accordance with the sale and leaseback transaction, in which all of the Defendants willingly participated, the Debtors were fraudulently deprived of the title to the Property and stripped of a substantial portion of the equity therein. Other than the $150,000 disbursement at the June 2007 closing, the Debtors never received any additional disbursement of the sale proceeds due to them according to the signed Settlement Statement.

...

89.     With the intent that the Debtors rely upon their statements for the purpose of inducing the Debtors to close on the sale of the Property to Wilson, Defendants Wilson, SJB, Velahos, Woodbury Title, Abrams and Lewis made numerous material misrepresentations and omissions of present and/or past facts to the Debtors, including by way of example, the fact that the Debtors were not going to receive a substantial portion of the proceeds from the sale of the Property.

...

90.     Defendants Wilson, Velahos, Woodbury Title, Abrams and Lewis had actual knowledge that the statements made to the Debtors were false at the time that such statements were made.

...

91.     The Debtors reasonably relied upon the material misrepresentations made to them by the Defendants in that they agreed to sell the Property to Wilson.

92.     As a direct and proximate result of the aforementioned Defendant's actions, Plaintiff Trustee, in the stead of the Debtors, has sustained damages.

Debtors relied on SJB's misrepresentations and omissions (*Id.*, ¶ 91); (4) defendants Velahos, Abrams, Lewis, and Woodbury Title, aided by Wilson and SJB acted to conceal material facts from the Debtors during closing and released funds inconsistent with the HUD statement (*Id.*, ¶¶ 31, 32, 34, 35, 44, 89); (5) Debtors suffered damages as a result (*Id.*, ¶ 92). These allegations on their face are sufficient to support by clear and convincing evidence a *prima facie* case for equitable and common law fraud, civil conspiracy, and aiding and abetting fraud and civil conspiracy against the Defaulting Parties. As well, Velahos, as a principal of Woodbury Title who abdicated his oversight responsibilities, contributed to the conduct of the parties here. *See Francis*, 87 N.J. at 44-45.

Once liability is established, if the damages sought are not for a "sum certain or for a sum which can by computation be made certain, Fed. R. Civ. P. 55(b))(1) the court may conduct such hearings or order such references as it deems necessary and proper. Fed. R. Civ. P. 55(b)(2)"; *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990). Even upon default, a court "may not rubber-stamp the non-defaulting party's damages calculation, but rather must ensure that there is a basis for the damages that are sought." *Overcash v. United Abstract Grp., Inc.*, 549 F. Supp. 2d 193, 196 (N.D. N.Y. 2008). However, a proof hearing is not required if there is sufficient documented evidence in the record to support a damages calculation. *Id.*; *see also Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154-55 (2d Cir. 1999). A trial court therefore has considerable discretion in determining whether a proof hearing is necessary to calculate damages.

Here, the Trustee seeks a determination that Debtors are owed $251,773.27 in compensatory damages in addition to punitive damages. Plaintiff's Post-Trial Brief, *supra*, at 8 (citing *Material Damage Adjustment Corp.*, 352 N.J. Super. at 232) ("The goal of compensatory

damages is to restore the plaintiff to the same position it was in prior to the occurrence of the wrong. This is true whether the wrong inflicted lies in contract or tort."). The Trustee contends that this amount represents the equity that was allegedly stripped from the Property and transferred to SJB at closing in violation of the HUD. First American objects, arguing that Trustee's calculation is based upon an unreliable contract price of $625,000. First American argues that Trustee has failed introduce any proof that this was the actual value of the Property at the time of closing. First American contends that Wilson was only able to resell the Property for $400,000. First American argues that based upon the resale price, it is more likely that the Debtors participated in a scheme to defraud the lender by inflating the contract price so as to permit Wilson to obtain a higher loan. In addition, First American argues that Debtors are not entitled to the $251,773.27 paid to SJB because Debtors agreed to accept only $150,000 notwithstanding the terms in the HUD.

This Court finds that Trustee has not set forth sufficient proofs to support his prayer for damages including punitive damages at this time on this record. Most importantly, Trustee has not provided a valuation of the Property at the time of the sale of the property to Wilson. Although Trustee contends that the Property was worth $625,000, that amount is unreliable as it is based upon a contract price that was set by SJB in furtherance of the fraudulent scheme. Moreover, the asserted resale price of the Property suggests that it might be worth considerably less than $625,000. Accordingly, Trustee's request for the entry of a default judgment against the defaulting parties is denied at this time. Default will be entered against Velahos, Abrams, Lewis, Woodbury Title and SJB pursuant to Rule 55(a) and the Trustee will be given the opportunity to supplement the record as to damages including punitive damages to support the entry of default judgment.

In addition, this Court finds that the varying degree of culpability among the Defaulting Parties requires an allocation of fault pursuant to New Jersey's Comparative Negligence Act. N.J.S.A. 2A:15–5.1 to –5.8; *Blazovic v. Andrich*, 124 N.J. 90, 112, 590 A.2d 222, 233 (1991) (holding that the Comparative Negligence Act applies to conduct characterized as intentional); *see also In re Curriden*, 2007 WL 2669431, at \*10-11.

In *Curriden*, Judge Wizmur considered a case with analogous facts.  In that case, the debtor, Gwen Curriden, was defrauded in connection with the sale of her home. Certain individuals, who were associated with a mortgage broker, conspired to defraud the debtor by causing her to pay illegal kickbacks at the time of closing. The complaint named these individuals, as well as the title company and its closing agent and part owner, who conducted the closing.  The court ultimately found that the "Mortgage Broker" defendants were liable under theories of common law fraud and conspiracy.  The court also found that the mortgage company itself was liable based upon vicarious liability for an employee agent involved in the conspiracy. However, with regard to the title company and its closing agent and part owner, the court held that "no such fraud or deceptive practices were established at trial against these defendants." *Id.* at \*20.  Despite some discrepancies in the record between the defendant's testimony at her deposition and at trial, the court specifically found that the closing agent was not liable "for conspiratorial participation in the scheme to defraud [debtor] of the equity in her home, or an intent to deceive, of for engaging in an unconscionable commercial practice." *Id.*

As in *Curriden*, the various Defendants in this case are not similarly situated.  For example, Lewis, the licensed title producer employed by Woodbury Title who attended the closing as settlement agent and notary and Abrams, a closer for Woodbury Title and settlement agent for the sale who was involved in the preparation of the HUD and the issuance of checks for

the closing, arguably cannot have the same degree of culpability as other defendants, like SJB,

who directly solicited the Torresses to enter into the fraudulent transaction. Accordingly, to the

extent that the Trustee continues to pursue a Default Judgment, he must address the comparative

fault and liability of the Defaulting Parties.

## IV.    Judgment Under Federal Rule of Civil Procedure 52(c)

Federal Rule of Civil Procedure 52(c) states:

> (c) Judgment on Partial Findings.  If a party has been fully heard on an issue
> during a nonjury trial and the court finds against the party on that issue, the court
> may enter judgment against the party on a claim or defense that, under the
> controlling law, can be maintained or defeated only with a favorable finding on
> that issue.  The court may, however, decline to render any judgment until the
> close of the evidence.  A judgment on partial findings must be supported by
> findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).

At the conclusion of the Trustee's presentation of his case, First American moved for

judgment under Rule 52(c).  The Court determined to hear the presentation of First American's

case.  Therefore, the Court need not decide the matter on the basis of Rule 52(c), but rather on

the complete evidentiary record.

## V.    Agency Law

" 'An agency relationship is created when one party consents to have another act on its

behalf, with the principal controlling and directing the acts of the agent.' " *Covington v. Int'l*

*Ass'n of Approved Basketball Officials*, 710 F.3d 114, 120 (3d Cir. 2013) (quoting *Sears*

*Mortgage Corp.*, 134 N.J. at 337).  "Generally, an agent may only bind his principal for such acts

that 'are within his actual or apparent authority.' " *New Jersey Lawyers' Fund for Client Prot. v.*

*Stewart Title Guar. Co.*, 203 N.J. 208, 220, 1 A.3d 632, 639 (2010) (quoting *Carlson v. Hannah*,

6 N.J. 202, 212, 78 A.2d 83 (1951)). "Vicarious liability due to an agency relationship can be based on the agent's actual authority. Vicarious liability can also be based on apparent authority. An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Covington*, 710 F.3d at 120 (citing Restatement (Third) of Agency § 2.01 (2006)). An agent acts with apparent authority "when a third party reasonably believes that the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Stewart Title Guar. Co.*, 203 N.J. at 220. Apparent authority "focuses on the reasonable expectations of third parties with whom the agent deals." *Id.*

## VI.   **First American's Liability**

The Trustee argues that First American is vicariously liable for the actions of its agent, Woodbury Title. Woodbury Title is First American's agent for the purpose of issuing title insurance. "A title insurance policy is a contract that protects a landowner against loss caused by defective title to the land." *Stewart Title Guar. Co.*, 203 N.J. at 217; *Shotmeyer v. N.J. Realty Title Ins. Co.*, 195 N.J. 72, 82, 948 A.2d 600 (2008). Individuals who are not "named insureds" under a policy cannot recover under the title policy. *Shotmeyer*, 195 N.J. at 87. The United States District Court for the District of New Jersey described the principles governing a title insurer's liability as follows:

> [I]n *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.*, 116 N.J. 517, 562 A.2d 208 (1989), the New Jersey Supreme Court held that "a title company's liability is limited to the policy and ... the company is not liable in tort for negligence," *id.* at 535, 562 A.2d 208, unless the company engaged in conduct by which it voluntarily assumed a duty in addition to those obligations created by the policy. *See id.* at 541, 562 A.2d 208. Thus, unless the insurer engages in affirmative conduct to assume a duty voluntarily on behalf of the insured, the title insurance policy governs the relationship between the insured and the insurer and limits the

causes of action which the insured may assert against the insurer. *See id.* at 540, 562 A.2d 208 ("Although we recognize that an insured expects a title company will conduct a reasonable title examination, the relationship is essentially contractual.").

*Stewart Title Guar. Co. v. Greenlands Realty, L.L.C.*, 58 F. Supp. 2d 370, 386 (D.N.J. 1999); *see also RTC Mortg. Trust 1994 N-1 v. Fid. Nat. Title Ins. Co.*, 58 F. Supp. 2d 503, 536 (D.N.J. 1999).

In *Sears*, the New Jersey Supreme Court considered whether a title insurer can be liable under an insurance policy to a buyer and third-party lender based upon the closing attorney's fraud and misappropriation of closing funds in connection with the real estate closing. 134 N.J. at 337-38. In assessing the agency relationship between the title insurer and the buyer's attorney, the court conducted a comprehensive review of the title insurance industry in New Jersey. *Id.* at 339-41. The court noted that in north Jersey closings, the buyer's attorney typically acts as the representative of, and performs the functions for, the title insurer in the same way as does the title agent in south Jersey. *Id.* at 340. The *Sears* court found that the record demonstrated sufficient indicia of the title insurer's control over the buyer's attorney to support an agency relationship. Here the court found:

> The record also demonstrates sufficient indicia of Commonwealth's control over Gillen to support an agency relationship. All communication was between Commonwealth and Gillen. Commonwealth gave Gillen its blank forms to use. In the title commitment, Commonwealth directed Gillen to pay off and cancel the Sears mortgage. (Commonwealth originally stated in its answer to Kaiser's complaint: "Gillen was directed to payoff and cancel of record the existing Allstate mortgage." Commonwealth amended that answer one month before the trial.) It sent him the title-insurance policy and billed him directly for insurance premiums. Gillen remitted payment on behalf of his client.

*Id.* at 345.

In *Sears* the court found that the title insurer was liable for the buyer's attorney's theft stating:

> We conclude that Gillen was Commonwealth's agent for the purposes of its dealings with Kaiser in effectuating title insurance. Further, as evidenced by its practice in protecting institutional lenders, Commonwealth was aware of the risk of defalcation of closing funds by such attorneys. By dealing solely with attorneys rather than with their clients, it

enabled the attorney to mislead or harm the purchaser. Commonwealth was in a position either to prevent or to protect against the loss suffered by Kaiser. Accordingly, we find that Commonwealth is liable for Gillen's theft.

*Id.* at 346.

According to the Trustee, *Sears* establishes a vicarious tort liability running from Woodbury Title to First American in this case. However, this Court declines to expansively read *Sears* to permit a non-insured seller to recover against a title insurer under agency theory.[14] Underlying the *Sears* holding is the contractual duty owed by the title insurer to the buyer under the title insurance policy. Unlike the buyer in *Sears*, a seller is simply not a party to the contract with the insurer, and therefore the insurer has no duty to protect the seller from the tortious acts of the title company.

Trustee also relies upon *Lawyers Title*, 361 F. Supp. 2d 443, for the proposition that First American can be held liable under agency theory. In that case, Lawyers Title Insurance Company, a title insurer, brought suit to recoup losses from its title agent for a fraudulent mortgage closing. The case involved two title companies – Phillips Title Agency and Central Title Agency. Phillips Title Agency had an arrangement with Central Title in which Phillips would refer customers to Central Title and perform certain closing services in return for a twenty percent commission on any resulting title insurance premium received by Central Title and a fee of $300.00 per closing. *Id.* at 444. Central Title issued title insurance as an agent of Lawyer's Title. Kevin Phillips, the owner of Phillips Title, misappropriated certain escrow funds at a real

---

[14] Various unpublished New Jersey cases have also expressly declined to read *Sears* as extending liability from a title insurer to a seller under agency theory. *Thurber v. Thurber*, No. A-4578-14T4, 2017 WL 164480, at *7 (App. Div. Jan. 17, 2017), *cert. denied*, No. 078935, 2017 WL 2098911 (N.J. May 5, 2017); *Karpontinis v. Multi-Solutions, Inc.*, 2013 N.J. Super. Unpub. LEXIS 641, at *9-10 (App. Div. Mar. 21, 2013), *cert. denied*, 214 N.J. 119, 67 A.3d 1193 (2013); *New Jersey Lawyer's Fund v. Flanagan*, 2014 N.J. Super. Unpub. LEXIS 1127, at *14-17 (Law Div. February 4, 2014). Although this Court is mindful that unpublished decisions do not constitute precedent in New Jersey, N.J. Ct. R. 1:36-3, the apparent unanimous consensus among these cases and the complete lack of authority to the contrary cannot be ignored.

estate closing.  The court found that this scheme was enabled wittingly or unwittingly by Susan

Brown, a notary public and employee of Phillips Title, and "designator closer" for transactions

referred to Central Title.  *Id.* at 444-45.  Lawyers Title sued Central Title under their agency

agreement. *Id.* at 445-46.  Paragraph 11, Section (e) of the agreement provided that the agent

(Central Title) shall be liable to the principal (Lawyers Title) for "[a]ny improper closing or

attempted closing by the Agent, including but not limited to (1) loss or misapplication of

customer funds . . . (2) failure to disburse properly or close in accordance with escrow or closing

instructions, (3) misappropriation of escrow or closing funds . . ." and Paragraph 12 of the

agreement provided that the "Principal shall be liable for all losses...damages, expenses and

costs arising out of claims covered by and based upon any title insurance commitments. . ." *Id.* at

447.

The court noted:

> Lawyers Title argues that Central Title is liable to it under Paragraph 11 of the
> Agreement for the wrongful conduct of Brown and Phillips. It argues that Brown
> negligently notarized forged signatures on the deed, note and mortgage for the sale of 665
> Garwood Road, and that Phillips fraudulently concocted the entire transaction and
> absconded with the mortgage proceeds. Lawyers Title contends that Brown and Phillips
> were agents of Central Title, and therefore their misconduct is imputed to Central Title.

*Id.* at 447.

Central Title argued that it could not be held liable for the fraudulent acts of Phillips and

Brown as Phillips and Brown were not its agents but independent contractors for whose torts

Central Title was not liable and alternatively if Brown and Phillips were its agents Central Title

was not liable for their unauthorized acts.  Central Title also contended that it should not be

required to indemnify Lawyers Title because Lawyers Title initiated the relationship between

Central Title and Phillips Title.  *Id.* at 448.  However, the Court held that Phillips Title, Phillips

and Brown were in fact Central Title's sub-agents for the purpose of fulfilling Central Title's

obligations to Lawyers Title because there existed a fiduciary relationship and these individuals had the "power to bind Central Title, a power possessed by agent independent contractors, but not non-agent independent contractors," and was therefore liable for the acts of its agents. *Id.* at 449. The court in so ruling stated:

> Central Title's argument that it is not liable for any wrong-doing by Phillips Title and Brown because they were independent contractors and not agents misses the mark. The categories of agent and independent contractor are not mutually exclusive.[10] Some independent contractors are agents, and a principal may be liable for their actions. *See* Restatement (Second) of Agency § 2 (1958). The crucial distinguishing feature between agent independent contractors and non-agent independent contractors is that an agent independent contractor has a fiduciary relationship with the principal, as existed here. Additionally, Phillips Title and Brown had the power to bind Central Title, a power possessed by agent independent contractors, but not non-agent independent contractors. Restatement (Second) of Agency § 12 (1958)("An agent or apparent agent holds a power to alter the legal relations between the principal and third persons").

> "[W]hile generally principals are not liable for the torts of their independent contractors, the common law is littered with exceptions ..." *American Tel. & Tel. Co. v. Winback and Conserve Program,* 42 F.3d 1421, 1437 (3d Cir.1994). The Third Circuit noted that in *Sears Mortgage Corp. v. Rose,* 134 N.J. 326, 634 A.2d 74 (1993), the New Jersey Supreme Court "eviscerated" the proposition that principals are never liable for the torts of their independent contractors. *Id.* at 1436 n. 17. *Sears Mortgage Corp.* held that a title insurer was liable to the purchaser of a property for the theft of funds by the buyer's attorney who served as a closing agent for the transaction. *Sears Mortgage Corp.,* 134 N.J. at 346, 634 A.2d 74. The New Jersey Supreme Court held that the buyer's attorney was an agent of the title insurer. *Id.* "Since it can in no way be argued that the attorney was the title insurer's servant, the [New Jersey Supreme Court] implicitly recognized the category of agent independent contractors." *Winback,* 42 F.3d at 1436 n. 17.

> Central Title is correct that principals are not liable for the acts of agents outside the scope of their authority. Central Title certainly would not be liable for any losses caused by Phillips Title in issuing homeowner's or automobile insurance. The issue in this case, however, is Central Title's liability for losses due to the negligent and fraudulent *manner* in which Phillips Title closed the transaction.

Closing a transaction is squarely within the scope of Phillips Title's authority as a subagent Central Title.

*Id.*

Trustee attempts to argue that under *Lawyers Title*, there exists here an agency relationship between First American Title Insurance and Woodbury Title giving rise to liability of First American on the Trustee's claims. However, *Lawyers Title* did not involve a claim by a third party seller against a title insurer. Rather it involved a claim *by* the title insurance company against *its* agent title company based upon the indemnification provisions contained in their agreement. *See Mussman*, 930 F.E.2d at 1166 (also distinguishing *Lawyers Title*).

More directly on point is *Duffy v. Lawyers Title Ins. Co.*, a case from the Eastern District of Pennsylvania. 972 F. Supp. 2d 683 (E.D. Pa. 2013). Similar to the case at bar, *Duffy* involved a mortgage rescue scheme, whereby certain third parties solicited plaintiffs to enter into a sale-leaseback transaction in order to save their home from foreclosure. *Id.* at 686. The plaintiffs claimed that the title insurer was liable under Pennsylvania's Unfair Trade Practices and Consumer Protection Law. First, the court granted summary judgment in favor of the insurer, noting that "[t]he seller of property has no need to be protected by a title insurance policy, nor does a seller have any reason to purchase a policy for a property which will be purchased by another party. It is the buyer and the lender that will benefit from the policy like the one issued by the defendant." *Id.* at 692. Second, the plaintiffs claimed that the title insurer was imputed with the knowledge of the scheme through their agents, including the title company that closed the transaction. *Id.* at 687. The court found that "[t]he actions of the title agents cannot be imputed to [the insurer] and there is no causal link between the policies issued by [the insurer] and the damages alleged by plaintiffs." *Id.* at 697-98. Although *Duffy* considered the issue

under Pennsylvania law, the case is factually analogous to the case at bar, and its reasoning is directly applicable.

Here, as in *Duffy*, the Debtors entered into a sale-leaseback transaction with the defendant SJB Holdings in an effort to save their home from foreclosure. Wilson, acting as a "straw buyer," purchased the Debtors home and, with the aid of the other Defaulting Defendants, the sale proceeds were distributed in a manner inconsistent with the HUD Statement. This scheme was made possible because Woodbury Title, its owner and employees distributed the proceeds in a manner inconsistent with the HUD Statement and absent approval from the lender. However, First American's role in all of this was simply to issue title insurance to Wilson. It did not have a contractual relationship with the Torreses, nor did it participate in the fraudulent scheme – it merely provided title insurance to the buyer.

In addition, the evidence presented by the Trustee fails to establish that Woodbury Title acted as First American's agent for purposes of closing the real estate transaction. The Agency Agreement provides the basis for Woodbury Title's actual authority. It provides in pertinent part:

APPOINTMENT OF AGENT

Insurer [First American] appoints Agent [Woodbury Title] as its representative, or agent, to originate and solicit applications for title insurance, to examine and issue commitments to insure, and to issue and countersign Policies of Title Insurance (sometimes hereinafter collectively referred to as the "Business of Title Insurance") in the State of New Jersey.

NON-EXCLUSIVE AGENCY

The appointment of Agent is on a non-exclusive basis. It is subject to the rights of other agents or representatives of Insurer now or hereafter appointed by Insurer to conduct the Business of Title Insurance.

Agency Agreement, Ex. P-21, ¶ 1.

This language limits the scope of Woodbury Title's agency to the origination and solicitation of title insurance. Notably, it does not provide Woodbury Title with the authority to conduct closings. Other sections of the Agency Agreement expressly prohibit Woodbury Title without the prior written approval of the Insurer from varying or changing the terms of the policy (Ex. P-21, ¶ 3(D)), or from receiving any funds, including escrow or closing funds on First American's behalf. (*Id.*, ¶ 3(F)). While First American is liable for policy losses, (*Id.* at ¶ 16) Woodbury Title bears responsibility and must indemnify First American for fraud in connection with "Escrow loss limited to losses occasioned by Agent's failure to disburse properly or close in accordance with escrow instructions, or where such escrow funds are misappropriated by Agent, its officers or employees." (*Id.*, ¶ 13.B.4.). These provisions further evidence that the Agreement does not establish that Woodbury Title acted with actual authority to close the transaction and to distribute the funds on behalf of First American.

As noted, this Court does not find that Woodbury Title acted with apparent authority. Such a finding would require evidence that the Debtors reasonably believed that Woodbury Title had authority to act on behalf of First American when it conducted the closing and that that belief was traceable to the principal First American's manifestations. *See Stewart Title Guar. Co.*, 203 N.J. at 220. As Debtors were not insureds or beneficiaries under the title insurance policy, it cannot be argued that they reasonably relied upon First American. Moreover, there is no evidence that the Torreses had any contact with First American or that Woodbury Title represented to them that it was conducting the closing on First American's behalf.

Accordingly, this Court finds that the Trustee does not have a cognizable claim against First American under agency theory. The facts adduced at trial also similarly failed to establish any other theories of liability in favor of the Trustee and against First American.

## CONCLUSION

For the foregoing reasons, <u>default</u> is entered against defendants Velahos, Abrams, Lewis, Woodbury Title and SJB.   The Court will conduct further hearings as to damages and to determine the appropriate entry of default judgment against the respective Defaulting Defendants on the Trustee's claims for common law fraud, equitable fraud, civil conspiracy, and aiding and abetting fraud and conspiracy.   This Court does not find liability against First American and in favor of the Trustee and therefore, all the claims of the Trustee against First American as set forth in the complaint are hereby DISMISSED with prejudice.

An Order shall be submitted in accordance with this decision.

DATED:  June 15, 2017

_Rosemary Gambardella_
ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE